## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| MEREDITH CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil No. 4:17-cv-385 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, Meredith Corporation ("Meredith"), by its undersigned counsel, brings this

action for a refund of illegally and erroneously assessed federal income taxes against the

defendant, the United States of America, and alleges on information and belief as follows:

### NATURE OF THE ACTION

1.     Meredith brings this action under 26 U.S.C. § 7422 for the recovery of federal

income taxes and interest erroneously and illegally assessed and collected by the Internal

Revenue Service (the "IRS"). Meredith properly claimed domestic production activities

deductions on its federal income tax returns related to the production and sale of its magazines,

integrated marketing materials, and books. The IRS improperly denied those deductions and

illegally assessed over $12 million in tax and interest against Meredith. Meredith paid the

assessed tax and interest under protest and now sues for a refund of that amount, plus statutory

interest.

## PARTIES

2.      Meredith is a publicly held media and marketing services company, headquartered in Des Moines since its founding in 1902. Among other business lines, Meredith is one of the United States' leading magazine publishers. Meredith is organized as a corporation under the laws of the State of Iowa with its principal place of business at 1716 Locust Avenue, Des Moines, Iowa.

3.      Meredith is the common parent of an affiliated group of domestic corporations that filed a consolidated U.S. federal income tax return for each of the tax years at issue in this action. Pursuant to 26 C.F.R. § 1.1502-77, Meredith is authorized to bring this action on behalf of the entities included in the consolidated group.

4.      Meredith maintained its books and records and filed its federal income tax returns on the basis of a fiscal year ending June 30 and using the accrual method of accounting during each of the taxable years here involved.

5.      Defendant is the United States of America.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422. This action is timely brought within the period prescribed by 26 U.S.C. § 6532(a)(1).

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1402(a)(2) because Meredith's principal place of business is located within this judicial district.

## THE SECTION 199 DEDUCTION

8.       Section 199 of the Internal Revenue Code (26 U.S.C. § 199) provides a deduction from federal income tax based on income derived from domestic production activities. This deduction is referred to herein as the "Section 199 deduction." Congress enacted the Section 199 deduction to "remove impediments in [the tax code] and make… manufacturing, service, and high-technology businesses and workers more competitive and productive both at home and abroad." *See* American Jobs Creation Act of 2004, Pub. L. 108-357, pmbl., 118 Stat. 1418 (2004).

9.       The Section 199 deduction is equal to a percentage of the lesser of (1) the taxpayer's qualified production activities income ("QPAI") or (2) taxable income (determined without regard to Section 199), provided that the claimed deduction does not exceed 50% of the W-2 wages properly allocable to domestic production gross receipts ("DPGR"). During Meredith's 2006 and 2007 tax years the applicable percentage was 3%; during Meredith's 2008, 2009, and 2010 tax years the percentage increased to 6%; and during Meredith's 2011 and 2012 tax years the percentage was increased further to 9%.

10.       QPAI is the excess of the taxpayer's DPGR for a particular taxable year over the cost and expenses properly allocable to such DPGR. DPGR is defined, in relevant part, as the gross receipts of the taxpayer that are derived from any lease, rental, license, sale, exchange, or other disposition of qualified production property ("QPP"), which was manufactured, produced, grown, or extracted ("MPGE") by the taxpayer in whole or in significant part within the United States.

11.    Under the relevant Treasury Regulation, if one taxpayer performs an MPGE

activity pursuant to a contract with another taxpayer, then "only the taxpayer that has the

benefits and burdens of ownership of the QPP . . . under Federal income tax principles" during

the period in which the MPGE of the QPP occurs is eligible to claim the Section 199

deduction. 26 C.F.R. § 1.199-3(f)(1).

12.    Under Eighth Circuit law, the question of who has the benefits and burdens of

ownership of property for federal income tax purposes is "a question of fact to be determined

by reference to the written agreements and the attendant facts and circumstances." *Upham v.*

*Comm'r*, 923 F.2d 1328, 1334 (8th Cir. 1991) (citation omitted).

13.    In the case of a bailment (such as a contract printing arrangement in which the

publisher supplies the paper to the printer), the benefits and burdens of ownership do not pass

to the bailee under general principles of federal tax law.

## FACTUAL ALLEGATIONS

14.    Meredith publishes more than 20 subscription magazines, including the

flagship brand *Better Homes & Gardens,* as well as nearly 140 special interest publications.

(For convenience, the magazines Meredith publishes are collectively referred to herein as

"Magazines.")

15.    Nearly 30 million people subscribe to Meredith's Magazines, and over 127

million people read a Meredith Magazine each year. When Meredith's customers pay

subscription fees or otherwise purchase Magazines, Meredith earns the resulting gross receipts.

16.     Meredith sells advertising in its Magazines to clients engaged in consumer marketing. When Meredith sells advertising to be used in the Magazines, Meredith earns the resulting gross receipts.

17.     Meredith's editorial staff exclusively creates and gathers the content and makes all decisions relating to the content, layout, and color of its Magazines, including the advertising to be included.

18.     Meredith does not print its Magazines in-house. Instead, Meredith contracts with several providers of commercial printing services to print copies of its Magazines based upon proofs which are produced, printed, and supplied by Meredith.

19.     Specifically during the 2006 through 2012 tax years, Meredith contracted primarily with three providers of commercial printing services with print operations in the United States to print Meredith's Magazines. Under those contracts, Meredith agreed to pay for printing services in accordance with the terms, conditions, and prices set forth in the contracts. While the printing agreements with each of the contract printers are not identical, the relevant terms are substantially similar.

20.     Under the terms of the printing agreements between Meredith and its contract printers:

        a.     Meredith created and owned all content of the Magazines. The contract printers played no role either in creating the content or in selling the advertising for the Magazines;

b.      The most expensive tangible component of the Magazines is the paper on which they are printed. Meredith purchased all of the paper to be used for its Magazines from its own high-volume suppliers and directed shipment of that paper to the contract printers. The paper remained Meredith's property throughout the printing process. The contract printers were required to segregate Meredith-supplied paper from their own paper supplies, and were not permitted to count Meredith-supplied paper as part of their inventory. The contract printers could not use Meredith-supplied paper for any purpose other than to print Meredith's Magazines;

c.      Meredith supplied the contract printers with paper mailing labels and preprinted material to be inserted into the Magazines or to be included with the Magazines;

d.      Meredith paid for the supply of ink and other component materials, such as certain polybag film and additional binding material, from the contract printers at a price per page;

e.      Meredith produced complete proofs of each page on its own printing equipment. These page proofs were then sent to the contract printer for reproduction in accordance with Meredith's precise specifications. In addition to the hardcopy proofs, Meredith provided locked digital files of the proofs to the contract printers. The hard, tangible proofs produced by Meredith, referred to as the "bluelines," were used to ensure that the information contained in the digital files and the reproductions coming off

the contract printers' presses conformed to the Meredith proofs in every respect;

f.      Meredith provided specific instructions that directed the printer as to the type of press to be used, the press signature (group of consecutive Magazine pages to be printed on one large sheet of paper and then cut and folded to form magazine pages), the form composition (group of signatures to be printed in a single run of press) for each Magazine edition, the Meredith-supplied inserts and onserts to be included, and the bindery lineup. The contract printers had no discretion to deviate from Meredith's instructions except with explicit prior permission from Meredith;

g.      Meredith closely monitored both the printing and the binding of the Magazines. Meredith quality control teams traveled to the printing location for very important or difficult jobs. In addition, the contract printers were required to pull page samples every hour on the press line, as well as bound Magazine samples every hour on the bindery line. Specified samples were collected and sent to Meredith by overnight delivery for inspection. Other samples were maintained by the contract printer for three months after the completion of each issue. Again, the printers could not deviate from Meredith's instructions without explicit prior permission from Meredith. This process ensured that the Magazines conformed to Meredith's specifications during all phases of production;

    h.      The contract printers shipped the printed, bound, and polyfilm bagged Magazines to Meredith's customers in accordance with Meredith's postal service sorting instructions, usually by sending the Magazines to specific postal service receiving points. Meredith paid all postage costs associated with the Magazines;

    i.      The contract printers could only transfer possession of the Magazines in accordance with Meredith's instructions, and they had no right to sell, exchange, or otherwise dispose of the Magazines in process or the finished Magazines;

    j.      The contract printers could not place a lien upon or hold onto the finished Magazines until payment was received, but had to transfer possession of the Magazines according to Meredith's production schedule.

21.     In the relevant tax years, Meredith published integrated marketing materials such as catalogs and custom magazines for corporate clients ("Integrated Marketing Materials").

22.     In the relevant tax years, Meredith contracted with several printers in the United States to print its Integrated Marketing Materials. Most of the Integrated Marketing Materials were printed by one of the three principal printers of Meredith's Magazines under the same printing agreements used for Meredith's Magazines. The terms of the agreements and the printing process described in paragraphs 19 and 20 applies equally to the Integrated Marketing Materials published by that printer.

23.     The rest of Meredith's Integrated Marketing Materials were printed by other contract printers. While not identical, the terms of the agreements with the contract printers and the printing process for Meredith's Integrated Marketing Materials were essentially the same as described in paragraphs 19 and 20.

24.     Meredith always purchased and supplied the paper for printing the Integrated Marketing Materials.

25.     In the relevant tax years, Meredith also published a variety of titles of books ("Books"). In each year, Meredith contracted with several printers in the United States to print its Books. While not identical, the terms of the agreements with the contract printers and the printing process for Meredith's Books were essentially the same as described in paragraphs 19 and 20.

26.     Meredith always purchased and supplied the paper for printing the Books.

27.     Meredith's printing agreements with the contract printers did not constitute, in substance or in form, a sale or other transfer of ownership of the Magazines, Integrated Marketing Materials, or Books from Meredith to the contract printers. While the contract printers had possession of the Magazines, Integrated Marketing Materials, or Books while they were being printed, Meredith always maintained substantive ownership and control of the Magazines, Integrated Marketing Materials, or Books throughout the printing process.

28.     The appropriate legal definition of the relationship between Meredith and its contract printers, based on the terms of the printing agreements and the conduct of the parties, is a bailment. Bailment is a fundamental concept in commercial law describing an arrangement

between two parties in which the possession of goods changes hands but ownership remains in the transferor. Contract printing is a quintessential example of a bailment when, as here, the customer provides the paper.

29.     The facts and circumstances of Meredith's printing arrangements with its contract printers, as summarized in paragraphs 18 through 28 above, indicate that Meredith maintained the benefits and burdens of ownership of the Magazines, Integrated Marketing Materials, and Books (the relevant QPP for purposes of Section 199) at all times during the tax years at issue, and therefore Meredith is entitled to the Section 199 deduction as to the resulting DPGR.

**TIMELY RETURNS AND PAYMENT**

30.     Meredith timely filed consolidated U.S. federal income tax returns for its tax years ending June 30, 2006, June 30, 2007, June 30, 2008, June 30, 2009, June 30, 2010, June 20, 2011, and June 30, 2012 (hereafter referred to as the "2006 tax year," "2007 tax year," "2008 tax year," "2009 tax year," "2010 tax year," "2011 tax year," and "2012 tax year," respectively, and the "2006 through 2012 tax years" collectively). Meredith made timely payments to the IRS in the amount shown on the tax return for each year within the time period prescribed by law.

31.     Because Meredith held the benefits and burdens of ownership of the Magazines, Integrated Marketing Materials, and Books throughout the printing process, Meredith included the income from the sale of the Magazines, Integrated Marketing Materials, and Books (i.e., the QPP) as part of its DPGR on its tax returns for each of the 2006 through 2012 tax years. Meredith also allocated cost of goods sold related to the Magazines, Integrated

Marketing Materials, and Books to DPGR for purposes of calculating QPAI.  Meredith

included those amounts in its calculation of the Section 199 deduction claimed on its 2006

through 2012 tax returns.

32.     In the 2006, 2008, and 2009 tax years, Meredith's claimed deduction was

calculated based on taxable income determined without regard to Section 199, as that amount

was less than Meredith's total QPAI. In the 2007, 2010, 2011, and 2012 tax years, Meredith's

claimed deduction was calculated based on the applicable percentage of QPAI, because in

those tax years, Meredith's QPAI was less than its taxable income (determined without regard

to Section 199).

33.     In each tax year, Meredith's claimed deduction did not exceed 50% of the W-2

wages properly allocable to DPGR that Meredith paid to its employees in each tax year.

34.     Meredith reported QPAI and claimed Section 199 deductions attributable to the

production and sale of the Magazines, Integrated Marketing Materials, and Books as follows:

| Tax Year | QPAI | Section 199 Deduction |
|---|---|---|
| 2006 | $85,866,146 | $2,269,276 |
| 2007 | $128,505,152 | $3,855,155 |
| 2008 | $127,135,905 | $7,564,811 |
| 2009 | $42,765,657 | $1,797,380 |
| 2010 | $47,222,935 | $2,833,377 |
| 2011 | $65,707,259 | $5,913,653 |
| 2012 | $16,795,231 | $1,511,571 |
| TOTAL | $513,998,285 | $25,745,223 |

35.     The IRS audited Meredith's returns for the 2006 through 2012 tax years. One of the issues the IRS examined in its audit was Meredith's claimed Section 199 deduction as to the production and sale of the Magazines, Integrated Marketing Materials, and Books.

36.     Over the course of IRS examinations that spanned almost ten years, Meredith fully cooperated with numerous IRS requests for information and provided documentation establishing that Meredith was entitled to the Section 199 deductions it claimed with respect to the Magazines, Integrated Marketing Materials, and Books.

37.     On April 26, 2016, the IRS issued Statutory Notices of Deficiency for the 2006 through 2012 tax years, disallowing all of Meredith's claimed Section 199 deductions with respect to the production and sale of the Magazines, Integrated Marketing Materials, and Books as set forth in paragraph 34 above.

38.     Specifically, the IRS determined that Meredith was not entitled to the Section 199 deduction based on the IRS's view that Meredith did not have the benefits of burdens of ownership of its Magazines, Integrated Marketing Materials, and Books while they were running through the contract printers' printing presses. This determination is erroneous and illegal because it is unsupported by the facts and misapplies the law.

39.     The IRS sent Meredith Notices of Tax Due on Federal Tax Return dated September 8, 2016, showing additional tax and interest in the amounts set forth below:

| Tax Year | Additional Tax Assessed | Deficiency Interest Assessed | Additional Interest Assessed | Total Amount Due |
|---|---|---|---|---|
| 2006 | $794,247.00 | 512,546.25 | -- | 1,306,793.25 |
| 2007 | 1,349,304.00 | 757,484.07 | -- | 2,106,788.07 |
| 2008 | 2,647,684.00 | 1,000,400.16 | -- | 3,648,084.16 |
| 2009 | 629,083.00 | 204,178.63 | -- | 833,261.63 |
| 2010 | 991,682.00 | 283,658.58 | 38.17[1] | 1,275,378.75 |
| 2011 | 2,069,779.00 | 328,442.74 | -- | 2,398,221.74 |
| 2012 | 529,050.00 | 66,805.81 | -- | 595,855.81 |
| TOTAL | $9,010,829.00 | 3,153,516.24 | 38.17 | 12,164,383.41 |

40.     On September 21, 2016, Meredith paid the entire amount of tax and interest shown on the Notices of Tax Due for each of the 2006 through 2012 tax years. The IRS subsequently refunded $1,933.91 of this amount as an interest adjustment as to the 2010 tax year.

**FILING AND DISALLOWANCE OF MEREDITH'S CLAIMS FOR REFUND**

41.     On April 26, 2017, Meredith filed claims for refund on Form 1120X for each of the 2006 through 2012 tax years, seeking refunds of federal income tax in the total amount of $9,010.829.00 and paid-in interest in the amount of $3,151,582.33, plus statutory interest thereon as allowed by law. The claims for refund for the 2006 through 2012 tax years were based on the disputed adjustments that the IRS asserted in the Statutory Notices of Deficiency described in paragraphs 37 through 39. Meredith's claims for refund are incorporated by this reference as if fully set forth herein.

---

[1] On information and belief, based on calculations provided by the Service, this $38.17 assessment of additional interest relates to interest paid on a refund of overpayment made on February 3, 2014, that has now been reversed as a consequence of the additional tax assessed as to the Section 199 issue.

42.     Meredith's claims for refund were timely filed with the IRS within six months after the expiration of the period for assessment as to each tax year, as extended by agreement, and within two years of the date of payment.

43.     Six months have passed since Meredith filed its claims for refund, and the IRS has taken no action on those claims.

44.     Although payment thereof has been demanded, no part of the sums described in paragraph 41 have been credited, remitted, refunded, or repaid to Meredith or to anyone on Meredith's account.

45.     Meredith has made no transfer or assignment of the claim for relief herein presented or any part thereof and is the sole and absolute owner of the claim.

46.     No action on this claim has been taken by the Congress of the United States or by any of the departments of the Government.

47.     No other suit or process by Meredith is pending on such claim in any other court.

## COUNT ONE: CLAIM FOR THE 2006 TAX YEAR

48.     Meredith incorporates by reference the allegations contained in paragraphs 1 through 47 as if fully set forth herein.

49.     The IRS's adjustment to Meredith's taxable income for the 2006 tax year is without factual basis and legally erroneous, and the resulting tax deficiency asserted for the 2006 tax year based on that adjustment is erroneous and illegal and must be rejected.

50.     Therefore, as to the 2006 tax year, Meredith overpaid its correct tax liability and is entitled to a refund of assessed and paid tax and interest of $1,306,793.25, together with statutory interest as provided by law.

## COUNT TWO: CLAIM FOR THE 2007 TAX YEAR

51.     Meredith incorporates by reference the allegations contained in paragraphs 1 through 47 as if fully set forth herein.

52.     The IRS's adjustment to Meredith's taxable income for the 2007 tax year is without factual basis and legally erroneous, and the resulting tax deficiency asserted for the 2007 tax year based on that adjustment is erroneous and illegal and must be rejected.

53.     Therefore, as to the 2007 tax year, Meredith overpaid its correct tax liability and is entitled to a refund of assessed and paid tax and interest of $2,106,788.07, together with statutory interest as provided by law.

## COUNT THREE: CLAIM FOR THE 2008 TAX YEAR

54.     Meredith incorporates by reference the allegations contained in paragraphs 1 through 47 as if fully set forth herein.

55.     The IRS's adjustment to Meredith's taxable income for the 2008 tax year is without factual basis and legally erroneous, and the resulting tax deficiency asserted for the 2008 tax year based on that adjustment is erroneous and illegal and must be rejected.

56.     Therefore, as to the 2008 tax year, Meredith overpaid its correct tax liability and is entitled to a refund of assessed and paid tax and interest of $3,648,084.16, together with statutory interest as provided by law.

## COUNT FOUR: CLAIM FOR THE 2009 TAX YEAR

57.    Meredith incorporates by reference the allegations contained in paragraphs 1 through 47 as if fully set forth herein.

58.    The IRS's adjustment to Meredith's taxable income for the 2009 tax year is without factual basis and legally erroneous, and the resulting tax deficiency asserted for the 2009 tax year based on that adjustment is erroneous and illegal and must be rejected.

59.    Therefore, as to the 2009 tax year, Meredith overpaid its correct tax liability and is entitled to a refund of assessed and paid tax and interest of $833,261.63, together with statutory interest as provided by law.

## COUNT FIVE: CLAIM FOR THE 2010 TAX YEAR

60.    Meredith incorporates by reference the allegations contained in paragraphs 1 through 47 as if fully set forth herein.

61.    The IRS's adjustment to Meredith's taxable income for the 2010 tax year is without factual basis and legally erroneous, and the resulting tax deficiency asserted for the 2010 tax year based on that adjustment is erroneous and illegal and must be rejected.

62.    Therefore, as to the 2010 tax year, Meredith overpaid its correct tax liability and is entitled to a refund of assessed and paid tax and interest of $1,273,444.84,[2] together with statutory interest as provided by law.

---

[2] This amount reflects the total refund amount claimed for the 2010 tax year minus the $1,933.91 in interest already refunded by the IRS as set forth in paragraph 40.

## COUNT SIX: CLAIM FOR THE 2011 TAX YEAR

63.     Meredith incorporates by reference the allegations contained in paragraphs 1 through 47 as if fully set forth herein.

64.     The IRS's adjustment to Meredith's taxable income for the 2011 tax year is without factual basis and legally erroneous, and the resulting tax deficiency asserted for the 2011 tax year based on that adjustment is erroneous and illegal and must be rejected.

65.     Therefore, as to the 2011 tax year, Meredith overpaid its correct tax liability and is entitled to a refund of assessed and paid tax and interest of $2,398,221.74, together with statutory interest as provided by law.

## COUNT SEVEN: CLAIM FOR THE 2012 TAX YEAR

66.     Meredith incorporates by reference the allegations contained in paragraphs 1 through 47 as if fully set forth herein.

67.     The IRS's adjustment to Meredith's taxable income for the 2012 tax year is without factual basis and legally erroneous, and the resulting tax deficiency asserted for the 2012 tax year based on that adjustment is erroneous and illegal and must be rejected.

68.     Therefore, as to the 2012 tax year, Meredith overpaid its correct tax liability and is entitled to a refund of assessed and paid tax and interest of $595,855.81, together with statutory interest as provided by law.

## COUNT EIGHT: INTEREST NETTING

69.     Meredith incorporates the allegations contained in paragraphs 1 through 68 as if fully set forth herein.

70.    With respect to the refunds resulting from the overpayments claimed in this action, Meredith is entitled to the benefit of 26 U.S.C. § 6621(d), which provides for a net interest rate of zero with respect to equivalent overpayments and underpayments for which interest is payable and allowable for overlapping periods of interest accrual.

## PRAYER FOR RELIEF

WHEREFORE, Meredith respectfully requests that the Court grant the following relief:

(a)    That this Court enter judgment with respect to Count One, in favor of Meredith and against the United States, in the total amount of $1,306,793.25, or such greater amount as this Court may determine to be legally refundable, together with statutory interest thereon as provided by law;

(b)    That this Court enter judgment with respect to Count Two, in favor of Meredith and against the United States, in the total amount of $2,106,788.07, or such greater amount as this Court may determine to be legally refundable, together with statutory interest thereon as provided by law;

(c)    That this Court enter judgment with respect to Count Three, in favor of Meredith and against the United States, in the total amount of $3,648,084.16, or such greater amount as this Court may determine to be legally refundable, together with statutory interest thereon as provided by law;

(d)    That this Court enter judgment with respect to Count Four, in favor of Meredith and against the United States, in the total amount of $833,261.63, or such greater amount as this Court may determine to be legally refundable, together with statutory interest thereon as provided by law;

(e)    That this Court enter judgment with respect to Count Five, in favor of Meredith and against the United States, in the total amount of $1,273,444.84, or such greater amount as this Court may determine to be legally refundable, together with statutory interest thereon as provided by law;

(f)    That this Court enter judgment with respect to Count Six, in favor of Meredith and against the United States, in the total amount of $2,398,221.74, or such greater amount as this Court may determine to be legally refundable, together with statutory interest thereon as provided by law;

(g)    That this Court enter judgment with respect to Count Seven, in favor of Meredith and against the United States, in the total amount of $595,855.81, or such greater amount as this Court may determine to be legally refundable, together with statutory interest thereon as provided by law;

(h)    That this Court enter judgment with respect to Count Eight, in favor of Meredith and against the United States, and award Meredith the benefit of interest netting in the calculation of interest pursuant to 26 U.S.C. § 6621(d); and

(i)    That this Court award Meredith its costs, including attorney's fees, and such other and further relief as this Court deems just and proper.

Dated this 30th day of October, 2017.

Respectfully submitted,

/s/ Stephen H. Locher
Stephen H. Locher
BELIN MCCORMICK P.C.

666 Walnut Street, Suite 2000
Des Moines, Iowa 50309-3989
Telephone: (515) 283-4610
Facsimile: (515) 558-0671
shlocher@belinmccormick.com

/s/ Robert J. Kovacev
Robert J. Kovacev
(*pro hac vice motion forthcoming*)

/s/ Lisa M. Zarlenga
Lisa M. Zarlenga
(*pro hac vice motion forthcoming*)

/s/ Carina C. Federico
Carina C. Federico
(*pro hac vice motion forthcoming*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-6462
Facsimile: (202) 429-3902
rkovacev@steptoe.com
lzarlenga@steptoe.com
cfederico@steptoe.com

ATTORNEYS FOR PLAINTIFF
MEREDITH CORPORATION