IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| MEREDITH CORPORATION, | * | |
| | * | |
| | * | |
| Plaintiff, | * | 4:17-cv-00385 |
| | * | |
| v. | * | |
| | * | |
| UNITED STATES OF AMERICA | * | ORDER ON BENCH TRIAL |
| | * | |
| | * | |
| Defendant. | * | |
| | * | |

Plaintiff Meredith Corporation filed this action against the United States under 26 U.S.C. § 7422 and seeks recovery of certain taxes paid for 2006 through 2012. ECF No. 1. After denying Plaintiff's Motion for Summary Judgment, ECF No. 55, the Court held a bench trial from October 21–23, 2019. The parties filed proposed findings of fact, proposed conclusions of law, and briefing with respect to an evidentiary issue on November 21. ECF Nos. 100–03. The parties then made final arguments on December 5. ECF No. 104. The case is fully submitted.

## I. FINDINGS OF FACT

Any action tried without a jury requires the Court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). In performing the related task of determining the credibility of a given witness and the weight to be accorded his or her testimony, the Court has taken into consideration the following:

> the witness's intelligence; the opportunity the witness had to see or hear the things testified about; a witness's memory, knowledge, education, and experience; any reasons a witness might have for testifying a certain way; how a witness acted while testifying; whether a witness said something different at another time; whether a witness's testimony sounded reasonable; and whether or to what extent a witness's testimony is consistent with other evidence [the Court] believe[s].

Model Civ. Jury Instr. 8th Cir. 3.03 (Comm. on Model Jury Instr. for the 8th Cir. 2019).

The parties stipulated to many facts. *See* ECF No. 60. The Court's factual findings include such stipulated facts, findings as to the credibility of the witnesses, findings based on admissible witness testimony, and additional findings based on admitted evidence.

### A. *Findings with Respect to Individuals and Entities*

The Court finds the following with respect to individuals and business entities who were the subject of admitted testimony on which the Court relied:

- Plaintiff is a publicly held media and marketing services company, headquartered in Des Moines, Iowa, since its 1902 founding. ECF No. 60 ¶ 3. Plaintiff is organized as a corporation under Iowa law with its principal place of business at 1716 Locust Avenue in Des Moines. *Id.* ¶ 4.

- Plaintiff is one of the United States' leading magazine publishers. *Id.* ¶ 3. It publishes more than twenty subscription magazines—including Better Homes & Gardens—and nearly 140 special interest publications. *Id.* ¶ 5. More than 127 million people read one of Plaintiff's magazines each year. *Id.* ¶ 6.

- Brad Waggoner works for LSC Communications, a printing company. ECF No. 98 at 6:4–8. LSC formed in 2016 as a spinoff of R.R. Donnelly & Sons Co. (RRD), another printing company that printed magazines for Plaintiff. *Id.* at 6:12–16. Waggoner appeared pursuant to a subpoena, which the Court finds boosted his credibility. *Id.* at 5:24–6:1. The Court found him very credible with respect to how RRD treated its relationship with Plaintiff. To the extent Waggoner strayed beyond his expertise to address matters of law, the Court found him less so.

- Kevin Turner also works at LSC. *Id.* at 85:22–24. Since 1995, he has worked mainly on Plaintiff's account with RRD or LSC. *Id.* at 86:24–87:6. During the events at issue, Waggoner managed Turner, and Turner managed no one. *Id.* at 107:23–25. The Court found Turner, who also appeared pursuant to a subpoena, *id.* at 85:12–14, credible with respect to Plaintiff's relationship with RRD. As with Waggoner, to the extent Turner strayed beyond his area of expertise to address matters of law or the views of other RRD departments, the Court found such testimony less credible.

- Chad Schumacher is Plaintiff's executive director of production. ECF No. 97 at 24:9–13. He has worked for Plaintiff for more than eighteen years and has worked in his current job since 2011. *Id.* at 24:23–24. He is responsible for production of Plaintiff's magazines and, among other things. *Id.* at 24:16–18. Before his current job, he analyzed printers' bids for Plaintiff's business, among other things. *Id.* at 25:2–7. Before joining Plaintiff in 2001, he worked for RRD on customer invoices, including Plaintiff's. *Id.* at

25:2–26:6. The Court found Schumacher generally credible with respect to his perception of the relationship between Plaintiff and RRD. However, the Court did consider that (1) Schumacher had a substantial interest in providing favorable testimony for Plaintiff, his employer; (2) he did not work on billing for RRD during the relevant period; and (3) he had no special training in tax law or accounting.

- Joseph Kohler is Plaintiff's quality director of production. ECF No. 98 at 171:14. He usually works out of Des Moines, *id.* at 171:12, but also has visited fourteen printing plants across the country during inspections for Plaintiff. *Id.* at 190:20–191:19. He has worked in the printing industry since 1985. *Id.* at 174:9. He has worked for Plaintiff since 2004. *Id.* at 171:20–172:22. Before that, he worked as a quality analyst for RRD and, before that, for Meredith/Burda, Plaintiff's prior printing unit that it sold to RRD in 1991. *Id.* at 172:24–173:25. The Court found him to be extremely credible with respect to the printing industry and the work he does for Plaintiff.

- Todd Nielsen is Plaintiff's director of paper purchasing. ECF No. 97 at 229:14–18. He negotiates contracts with paper mills and procures paper for Plaintiff's publications. He has had that job for three years. *Id.* at 230:4. Prior to that, he was the senior paper purchasing manager for eleven years. *Id.* at 230:8–9. Before that, he worked in various positions—including one in the paper warehouse—at RRD. *Id.* at 230:23–231:6. The Court found Nielsen credible with respect to Plaintiff's customs and intent in purchasing paper. The Court, by contrast, found him less credible on legal or accounting matters when they strayed beyond his knowledge and expertise.

- Raymond Prince was the case's only expert witness. ECF No. 60 ¶ 183. Prince has worked in the printing industry for sixty years and is an expert in its processes, customs, standards, and practices. *Id.* He was qualified as an expert by knowledge, skill, experience, training, or education. *Id.* ¶ 184. In a notable wrinkle, Prince served as the Government's expert witness in *ADVO, Inc. v. Comm'r*, 141 T.C. 298 (2013), which involved the same manufacturing tax deduction as this case. ECF No. 60 ¶ 185. In *ADVO*, he testified that the printers exerted almost exclusive control over the printing process. ECF No. 90-7 at 34. Although Prince's credibility may be impacted here slightly because Plaintiff retained him, such is the case with almost all expert witnesses. The Court also found his *ADVO* experience helpful. Furthermore, the Court found Prince's testimony credible with respect to printing industry norms.

- Christine Maki has been the head of RRD's tax department since 2008 and is familiar with RRD's tax records and recordkeeping practices. ECF No. 60 ¶ 305. She also supervised the company's communication with the Internal Revenue Service (IRS), including a 2009 letter concerning RRD's § 199 deductions. *Id.* ¶ 308. Maki testified by deposition, so the Court could not observe her demeanor. Furthermore, the Court found Maki appeared less credible when discussing the tax work of departments in other RRD offices because she appeared to lack first-hand knowledge of some events. The Court found she otherwise appeared credible, considering her testimony's format.

- Doris Ann Gephart retired as a customer service representative at LSC in September 2018. ECF No. 72 at 13:7–8. Before that, she held the same job at RRD. *Id.* at 14:14–15. From 2007 until 2018, she worked with Plaintiff. *Id.* at 18:1–5. Her office was at RRD's plant in Mattoon, Illinois, and she went into the printing area often. *Id.* at 72:16–73:8. She spoke with her counterpart in Plaintiff's office several times a day. *Id.* at 20:14–18. Gephart also testified by deposition so the Court was not able to assess her credibility in person. Nevertheless, the Court found her credible on matters within her purview, considering her testimony's format.

- John Beard works for Plaintiff as a director of production who mainly oversees Better Homes & Gardens, among other publications. ECF No. 97 at 142:9–143:5. During the years at issue, he worked with advertisers, editorial staff, and printers to help shape the appearance of magazines. *Id.* at 143:11–25. He has worked for Plaintiff since 2002. *Id.* at 144:19. Before that, he worked for RRD as a customer account manager on Better Homes & Gardens. *Id.* at 144:21–23. The Court found him credible with respect to matters under his purview while working for Plaintiff, with the caveat that, like his colleagues, he testified in a case in which his employer stood to benefit. The Court found Beard less credible with respect to his experience at RRD because his time there did not overlap with the tax years at issue.

- Charles Howell is Plaintiff's senior vice president for strategic sourcing, production, and operations. ECF No. 98 at 124:16–19. He has worked for Plaintiff since 2001. *Id.* at 126:8–9. In 2006, he started Plaintiff's strategic sourcing group, which involved trying to lower the price of contracts with both printers and paper vendors. *Id.* at 126:20–127:12. In 2011, he also began working on production operations, which included working with the digital files used to print Plaintiff's publications. *Id.* at 126:10–126:19. The Court found him credible with respect to Plaintiff's cost-saving attempts after 2006 but less so with respect to contract interpretation, matters before 2006, and RRD's day-to-day relationship with its vendors.

- Sheila Weirich is Plaintiff's director of risk management. *Id.* at 156:23–157:7. She has worked for Plaintiff for more than thirty-eight years, *id.* at 158:1, and her responsibilities include purchasing insurance and handling losses, *id.* at 157:9–12. She has had an "associate in risk management," an Insurance Institute of America designation, for twenty-seven years. *Id.* at 157:17–21. The Court found her to be very credible on matters of insurance and risk.

## B.  *Findings with Respect to the Events at Issue*

Considering the foregoing credibility findings, the Court found the following with respect to the events at issue.

During the years in question, as now, Plaintiff sold advertising space in magazines and then sold copies of those magazines through subscriptions and newsstands. ECF No. 60 ¶ 6–7.

It also sold integrated marketing materials and books. *Id.* ¶¶ 8–10.  Since 1990, Plaintiff has contracted with full-time printing companies to print its publications. *Id.* ¶ 14.  This case is about whether Plaintiff should have received a tax deduction designed for manufacturers—but used by many industries—on the revenue gained from its publications. *See* Cong. Research Serv., R41988, *The Section 199 Production Activities Deduction: Background and Analysis* 1, 11–12 (2017) (detailing § 199 claims by industry).

   1.   Before Printing

   Publications generally require paper.  And long before an article was written, a photograph was taken, or a page was printed, Plaintiff bought a lot of paper.  ECF No. 90-3 at 25.  Plaintiff spent millions of dollars, *id*, on thousands of tons a year, *id.* at 27–28.  Given the substantial expense, changes in paper price could affect how often Plaintiff publishes a given magazine or in what form.  ECF No. 97 at 240:16–19.  Therefore, Plaintiff tried to lock in paper prices for at least six months at a time.  *Id.* at 242:11–20.

   Not all publishers dealt with the paper market's hassles.  ECF No. 92-15 at 61:11–14.  Many bought paper from their printers at a markup.  *See* ECF No. 97 at 43:2–9; ECF No. 98 at 128:18–1294.  However, given Plaintiff's market position, it believed it could buy paper itself at a lower price.  ECF No. 60 ¶ 67.  Doing so also allowed it to control its publications' quality.  *Id.* For instance, Plaintiff believed certain types of paper suggested a higher quality magazine.  ECF No. 97 at 253:20–25.  Plaintiff also wanted to ensure its paper worked with printers' presses.  *Id.* at 246:7–17.

   After Plaintiff secured contracts with several paper mills, the mills to ship massive rolls of paper to its printers.  ECF No. 97 at 182:8, 256:3–4; ECF No. 98 at 19:6.  The printers unloaded the paper, inspected it for damage, and then stored it in a section of the warehouse

reserved for Plaintiff's paper.  ECF No. 97 at 249:13–17; ECF No. 98 at 19:7–13.  Plaintiff

measured the amount of paper stored with a printer at any moment in tons.  ECF No. 97 at

243:21.  The paper, at this point, unquestionably remained Plaintiff's property.  ECF No. 60

¶¶ 71–73.  The printers were not allowed to use it for other customers without purchasing it from

Plaintiff or breaching their contract.  *Id.* ¶ 76–77; ECF No. 97 at 259:17–260:23.  The printers

could not permit liens or encumbrances by third parties on Plaintiff's paper in its possession.

ECF No. 60 ¶ 75.  And even for Plaintiff's publications, the printers only could use certain paper

amounts.  *See id.* ¶¶ 90–91.  Regardless of how much a printer used, Plaintiff maintained

ownership of blank paper taken off the start of a roll and the blank paper left at the end.  *Id.* ¶ 81;

ECF No. 97 at 250:17–251:8.

Plaintiff also spent a lot of time and money producing the words and images that

appeared on its paper.  ECF No. 60 ¶ 24.  Articles were pitched, written, and edited.  *Id.* ¶¶ 32–

35.  Photographs were taken.  *Id.* ¶ 36.  Ads were sold.  *Id.* ¶ 7.  Plaintiff combined this content

into large files that instructed the printers' presses how to replicate publications.  *Id.* ¶¶ 47–53,

59.  Plaintiff always owned this intangible and intellectual property.  *Id.* ¶ 198.  Plaintiff also

produced physical proofs with its own printers to create a model of how the final magazine

should appear.  *Id.* ¶¶ 54–58.

2.  Printing

Plaintiff mainly used three companies to print its publications: RRD, Quad/Graphics, Inc.

(Quad), and Brown Printing Company (Brown).  *Id.* ¶ 15.  These firms were the only printers

large enough to accommodate Plaintiff's volume.[1]  *Id.* ¶ 16.  RRD, for instance, printed materials

---

[1] Plaintiff also used some smaller commercial printers for some of its integrated
marketing materials.  ECF No. 60 ¶ 19.

for thousands of companies. ECF No. 92-15 at 78:2–3. Yet Plaintiff still only was RRD's thirteenth customer by sales for 2006 and 2007. *Id.* at 41:16–42:2. RRD's arrangement with each customer varied. *Id.* at 75:13–17.[2]

After the printers received Plaintiff's files and proofs, Plaintiff held a preproduction phone call in which Plaintiff's employees relayed any pages or advertisements of importance and how the printers should apply ink to its paper. ECF No. 98 at 184:4–6; ECF No. 72 at 31:19–32:2. These calls happened each month at least two days before printing for several publications. ECF No. 98 at 184:18–25. With RRD, Plaintiff had meetings every two weeks to discuss new initiatives and instructions, testing of different materials, quality critiques, and procedures that the printer must implement. ECF No. 60 ¶ 156. Plaintiff's printing contracts meanwhile provided detailed standards for the clarity of type, image position, permissible color bleed, and position variation. *Id.* ¶ 137; ECF No. 98 at 200:15–21. These standards were stricter for select copies of each issue that were sent to advertisers and other important readers. ECF No. 98 at 201:4–19. Plaintiff also specified what types of printing presses the printers must use in order to balance quality and efficiency, although printer had to agree to such choices. ECF No. 60 ¶ 99; ECF No. 97 at 56:5–23, 255:12–17.

Printers then manipulated large metal plates or cylinders to recreate Plaintiff's digital print file on Plaintiff's paper. ECF No. 98 at 182:9–183:23; ECF No. 60 ¶ 288. These cylinders and plates—purchased and manipulated by the printers—were the printers' property. ECF No. 60 ¶ 289; ECF No. 98 at 183:6–22. However, RRD charged Plaintiff for a new cylinder's cost when Plaintiff changed the trim size of its magazine ECF No. 60 ¶ 211. Printers then loaded

---

[2] At trial and in their stipulated facts, the parties focused mainly on the substance of Plaintiff's relationship with RRD, its dominant printer. The parties did not provide the same detail for Plaintiff's relationship with other printers.

Plaintiff's large rolls of paper onto their presses and began printing pages based on Plaintiff's instructions. *Id.* ¶¶ 104, 292–93. The printers provided the ink, binding material, and packaging. *Id.* ¶ 230.

Even as the printers applied its property and labor to Plaintiff's paper, numerous witnesses testified that Plaintiff owned the paper the entire time it was in the printers' possession. This included Waggoner, RRD's negotiator for Plaintiff's contract, who testified that Plaintiff still owned the paper when it was on RRD's presses and binding machines. ECF No. 98 at 29:23–30:11, 71:12–17, 79:20–21. Similarly, Schumacher, Plaintiff's negotiator for the RRD contract, testified that Plaintiff owned the paper throughout the printing process and none of his RRD counterparts told him otherwise. ECF No. 97 at 104:12–18, 105:6–9. Finally, Maki, RRD's chief tax executive, testified in her deposition that when RRD valued a work in process for accounting purposes, it did not include Plaintiff's paper. ECF No. 92-15 at 95:8–20 ("[I]f a customer supplied paper, there was no asset on our books related to that."). And when asked whether legal title to Plaintiff's paper ever transferred to RRD, she responded "my understanding is that we . . . did not take title to supplied paper."[3] *Id.* at 48:1–4.

Prince, Plaintiff's unrebutted expert witness, testified at trial and in his expert report that, under industry custom, a publisher maintains ownership of paper it supplies to a contract printer.

---

[3] To be sure, Waggoner later indicated that the work in process included, in his opinion, manipulated paper and that the work in process was RRD's property until title passed to Plaintiff under the contract. ECF No. 98 at 50:18–51:8, 53:12–21, 72:9–12. But he did not reconcile this statement with his repeated assertions that Plaintiff never forfeited ownership of the paper. *See id.* at 79:20–21. So too with Maki, who on redirect examination by the Government's attorney, said she believed RRD owned the work in process and that it included Plaintiff's paper, even if the value of that paper was not recorded in RRD's valuation of the work in process. ECF No. 92-15 at 98:18–99:2. Like Waggoner, she never reconciled this latter view of ownership with her repeatedly asserted view that Plaintiff always owned its paper. *See id.* at 101:16–102:18 ("I don't know how to answer that question.").

ECF No. 99 at 55:11–57:18.  If the printers and Plaintiff intended otherwise, he said, there likely would be some explicit transfer of paper ownership in the contract.  *Id.* at 169:3 –171:2.  He also testified that when a publisher supplies the paper to the printer, industry custom provides that the term "work in process refers to the labor and materials that the printer has expended," not the publisher's paper.  ECF No. 90-7 at 30 § 4.  Lastly, he opined that given the case's facts and industry custom, the printers' work for Plaintiff was a provision of printing services, not a sale of a publication.  ECF No. 99 at 166:24–167:4.[4]

3.  Quality Control

What happened next varied by publication and issue.  Plaintiff employed two full-time and three part-time employees to visit printers and supervise printing—a so-called "press check." ECF No. 60 ¶ 139; ECF No. 98 at 185:5–9.  Often, but not always, one of these employees would be at the plant to ensure the printers matched the color provided in Plaintiff's proofs.[5] ECF No. 98 at 188:14–25.

During these visits, Plaintiff's employee went onto the plant's floor and examined early copies of pages coming off a printing press.  *Id.* at 185:11–19.  Plaintiff's employee would then

---

[4] The Government argues the Court should give Prince's testimony exceedingly little weight because he provides no external authority for the trade customs he describes.  Although Prince's lack of citations does weaken his assertions, the Court does not dismiss them.  The Government also did not present any testimony—expert or otherwise—to the contrary.

[5] It remains unclear how often one of Plaintiff's employees traveled to a printer for a press check.  Joseph Koehler testified that an employee was present about half the time.  ECF No. 98 at 188:14–15.  Plaintiff made press checks more frequently for integrated marketing materials to ensure printers met clients' desires.  ECF No. 60 ¶ 142.  It also appears Plaintiff's employees were more present during the first half of the period at issue.  Until 2009, Plaintiff had a full-time employee stationed at the RRD's Mattoon, Illinois, plant—where it printed Better Homes & Gardens—for on-site reviews of printed signatures, particularly for color compliance. *Id.* ¶ 143.  Plaintiff also had a full-time employee stationed in the Milwaukee area to perform the same function at Quad's Wisconsin plants.  *Id.*  Because these employees were always on hand to conduct such press checks, the Court finds one of Plaintiff's employees was physically at a printing press for *at least* half of the press checks during the whole period at issue.

compare that page to the proof produced by Plaintiff.  *Id.* at 185:22.  If the printer's page did not match Plaintiff's proof, Plaintiff had several options.  If Plaintiff discovered the issue stemmed from its digital file, it decided whether to stop the printer's press until Plaintiff provided a corrected file.  *Id.* at 186:1–13.  If the Plaintiff's employee suspected an imbalance in the printer's ink rollers, he could direct the printers to shut down the press and fix the imbalance.  *Id.* at 186:13–16.  Or if the Plaintiff suspected the printer did not properly set the right ink mixture, the Plaintiff could control adjustments.[6]  *Id.* at 186:18–25.

Once Plaintiff's employee was satisfied the press had matched Plaintiff's proof, the printers presented several additional sample pages, which Plaintiff's employee inspected again for defects.  *Id.* at 187:16–21.  Plaintiff's employee and the printer's employee then signed the samples of which Plaintiff approved.  *Id.* at 187:20–21.  Plaintiff then directed the printer to match all future printing to the signed samples.  *Id.* at 187:22–24.  The process took two-to-four days for a single month's issue.  *Id.* at 190:10–13.  Koehler testified that he visited four RRD plants, seven Quad plants, and three Brown plants.  *Id.* at 190:20–191:19.

The quality-control process differed when one of Plaintiff's employees was not present at the printer's plant.  As printing started, RRD, for instance, would be in regular contact with Plaintiff—sometimes making pre-dawn phone calls to discuss "something that did not look right."  ECF No. 72 at 32:12–20; *see also* ECF No. 97 at 213:1–214:17.  Some of these phone

---

[6] Koehler testified that the printers' employees would physically touch the keyboard to adjust the ink mixture while he would dictate directions.  ECF No. 98 at 186:24–25.  He also testified that Plaintiff's employees were not allowed to touch the printers' presses.  *Id.* at 188:6.  Before trial, the parties stipulated that, "[d]uring a press check, *Meredith employees* would set color on press manually using a keyboard on the press that determines the levels of the four colors of ink."  ECF No. 60 ¶ 141 (emphasis added).  To the extent there is a difference between Koehler's testimony and this stipulated fact, the Court finds Plaintiff nevertheless controlled how ink was adjusted during a press check, regardless of who touched the keyboard.

calls came while the publications were on the printers' presses.  ECF No. 97 at 201:7–8.  The printers then sent Koehler sample pages—via overnight shipping—within twenty-four hours of starting Plaintiff's press run and before binding any pages.  ECF No. 60 ¶¶ 146–47.  Koehler then inspected the samples much like he would at a printer's plant.  ECF No. 98 at 192:5–11.  Assuming Plaintiff approved the samples, printers would bind pages together into a magazine.  *Id.* at 29:3–4.  The printers then sent Plaintiff the first copies of fully bound magazines to be inspected for proper assembly, *id.* at 196:19–197:25, and more samples, still, within twenty-four hours after the printers started binding magazines to be inspected for color and workmanship, again.  *Id.* at 198:16–25.  If Koehler spotted a problem, he alerted the printer and "ma[de] sure it d[id]n't go out."  *Id.* at 199:12–14.  Plaintiff did all this because "[o]ur name is on it."  ECF No. 98 at 199:17–18.  The printers then shipped the publications to readers.  *Id.* at 60:20–61:2.

At trial, most witnesses, including Waggoner, testified at some point that the printers provided Plaintiff with a service.  *E.g.*, *id.* at 76:4 (testifying that RRD was "getting paid for our service).  However, Maki testified that she believed RRD sold a finished product to Plaintiff, although she also testified RRD never took title to Plaintiff's paper and did not sell paper back to Plaintiff.  *Compare* ECF No. 92-15 at 53:21–54:9, *with id.* at 102:1–18.

4.   Costs and Risks

Even excluding the millions of dollars spent on postage, advertising, and editorial content, the magazine production process cost both Plaintiff and the printers a lot of money.  ECF No. 60 ¶ 174.  In fiscal year 2008, RRD spent the following on Plaintiff's publications:

- $23,781,035 for printing work.  *Id.*

- $10,191,872 for the ink, packaging, binding, and other materials.  *Id.*

- $7,174,675 for packing and shipping activities.  *Id.*

Plaintiff, meanwhile, spent:

- $46,637,711 for paper.  *Id.*

- $6,727,452 for the advertising inserts, subscription cards, pre-printed advertising inserts, or other cards inserted into publications.  *Id.*

- $1,826,078 for Plaintiff's share of production and quality control.  *Id.*

Plaintiff also paid state personal property taxes on the paper and work in process at RRD's Kentucky printing plants for 2006 through 2012.  ECF No. 60 ¶ 86; *see also* ECF No. 88-5 at 1 (showing Plaintiff stored millions of dollars' worth of property in RRD's Kentucky plants).  The printers did not charge Plaintiff sales taxes.  *See* ECF Nos. 87-7, 87-12, 87-13.

Given these costs, Plaintiff and its printers employed various techniques to mitigate risk.  First, the contracts required the printers to carry property insurance on Plaintiff's paper while it was in storage.  ECF No. 60 ¶¶ 178, 182, 250.  Most of the contracts at issue stated the printers bore the risk of loss until either shipment or invoicing.  ECF No. 96-3 at 27 ¶ 43; ECF No. 85-2 at 29 ¶ 43; ECF No. 85-5 at 151 ¶ 54; ECF No. 85-6 at 22 ¶ 41; ECF No. 85-11 at 163 ¶ 12.1.  Some later contracts—signed after Plaintiff became aware of the § 199 issue—refer instead to a printer's "duty to protect," ECF No. 85-9 at 31 ¶ 41, or "duty of care," ECF No. 85-12 at 37 ¶ 12.2.  Plaintiff carried insurance on its paper, too, but the contract did not mandate it do so.  ECF No. 60 ¶¶ 176, 252.

Second, if an advertiser demanded a refund from Plaintiff because the printers did not satisfactorily reproduce an ad, the printers owed Plaintiff a credit for the actual cost of printing.  *E.g.*, ECF No. 60 ¶ 166; ECF No. 96-3 at 17 ¶ 24.2  But barring "intentional, fraudulent, or reckless acts, willful misconduct, or gross negligence," the printers did not have to reimburse Plaintiff for lost profits or advertising revenue.  ECF No. 60 ¶ 165–66.  The record lacks any

mention of such egregious conduct by the printers.  Plaintiff, meanwhile, offered unrebutted testimony that defective printing had in fact left Plaintiff on the hook with advertisers.  ECF No. 97 at 47:23–48:9; ECF 98 at 94:6–16; ECF No. 88-24 at 2.  For instance, a misprinted ad could cost Plaintiff $50,000 in ad revenue while the ad's printer lost just $15,000 in printing fees. ECF No. 97 at 47:23–48:3.

And finally, Plaintiff and its printers negotiated how to share in cost changes.  The contracts stated ink prices at a per-occurrence rate.  ECF No. 60 ¶¶ 18, 265–67.  The 2005–2011 Better Homes & Garden contract, for instance, stated ink prices "will be adjusted based on industry-wide percentage price increases which occur on or after January 1, 2006."  ECF No. 96-3 at 9 ¶ 13.1; *see also* ECF No. 97 at 85:9–11 (testifying that the contract required RRD to pass on increased ink costs to Plaintiff).  Furthermore, special color ink was to be billed at cost, plus a fixed fee.  *E.g.*, ECF No. 85-2 at 65.  Similarly, the 2006 Quad contract stated Quad "shall increase or decrease the ink prices in the Price Schedule by adding thereto or subtracting therefrom the *actual percentage increase or decrease of Printer's cost*."  ECF No. 85-6 at 9 ¶ 14.3 (emphasis added); *see also* ECF No. 85-12 at 32 ¶ 5.3.1 (showing prices for Brown-supplied materials, including ink, were subject to change based on Brown's costs).  Plaintiff, RRD, and Quad moved to a different price regime toward the end of the disputed tax years.  The 2011 RRD contract stated ink prices would be tied to changes in the Department of Labor's consumer price index (CPI).  ECF No. 85-5 at 131–32 ¶ 13.1.  The 2012 Quad contract linked ink prices to the CPI too, ECF No. 85-9 at 18 ¶ 14.3, while the 2011 Brown contract did not, ECF No. 85-12 at 32 ¶ 5.3.1.

With labor, Plaintiff and its printers adjusted manufacturing prices yearly according to another CPI formula.  *E.g.*, ECF No. 96-3 at 10 ¶ 15.1; ECF No. 85-6  at 8 ¶ 14.1  Meanwhile,

Plaintiff had to pay for overtime work, but only if its own paper or altered production scheduled created the need for that overtime.  *E.g.*, ECF No. 96-3 at 15 ¶ 21.  With manufacturing efficiencies, the contracts required the printers to negotiate new prices or pay Plaintiff a credit if printers reduced their costs through new technology.  *E.g.*, *id.* at 17 ¶ 25.2; *see also* ECF No. 60 ¶ 269.

This new technology provision came into play when printers found a way to use less color ink per page.  ECF No. 97 at 74:21–75:22; ECF No. 87-5 at 2–4.  That technology, "gray component replacement" (GCR), used more black ink, which is cheap, and less color ink, which is not, to replicate colors on a page.  ECF No. 97 at 75:1–3.  The printers did not tell Plaintiff about the new efficiency and its impact on costs.  *Id.* at 75:9–11.  Plaintiff nevertheless discovered it and did not approve of the secrecy.  ECF No. 87-5 at 28; ECF No. 97 at 75:5–7.  Citing the contracts' new technology provisions, Plaintiff negotiated reduced ink prices with RRD, Brown, and Quad.  ECF No. 97 at 75:20–22, 77:21–25, 79:2–6.

RRD disputed whether the contract required it to reduce Plaintiff's costs.  ECF No. 87-5 at 27.  Yet other printers, apparently, agreed with Plaintiff's interpretation of the new technology clause.  *See id.* at 28 (showing Plaintiff believed the contract required RRD to share reductions in ink costs and that other large printers believed the same).  And, regardless, RRD eventually agreed to Plaintiff's demands.  *Id.* at 27; *see also* ECF No. 98 at 296:18–19 ("[T]here was an agreement to share in the ink savings."); ECF No. 97 at 78:21–79:6.  In other words, Plaintiff shared the profits of an improved manufacturing process in at least this instance.[7]

---

[7] Prince, Plaintiff's expert, also testified that Plaintiff's ability to notice its printers began using GCR demonstrated "control" and that "[t]hey are watching their printers carefully because they're concerned about the quality of the jobs."  ECF No. 99 at 80:15–16, 81:4.

Finally, with paper, Plaintiff covered all costs with respect to changes in paper prices. ECF No. 60 ¶¶ 93–94.  To the extent the printers used less paper than expected, Plaintiff generally received half the value of those savings.  *E.g.*, ECF No. 96-3 ¶ at 3 ¶ 5.1; ECF No. 85-7 at 81–82; ECF No. 85-5 at 125 ¶ 5.1.  By contrast, the printers had to pay Plaintiff the full cost of paper overconsumption.  ECF No. 60 ¶ 90.

### 5.   Contract Negotiations and § 199

Beginning in 2008, Plaintiff sought to renegotiate its printing contracts to ensure it was entitled to a § 199 deduction.  *Id.* ¶ 237.  Schumacher and Waggoner, among others, conducted such negotiations for Plaintiff and RRD, respectively.  ECF No. 97 at 91:16–19, 95:8–10; ECF No. 98 at 18:8–11.  Unsurprisingly, both sides wanted to claim the tax deduction.  *See* ECF No. 92-2.

RRD tax specialists concluded the printer was entitled to a § 199 deduction because of its control, risk of loss, legal title, and ability to profit during the printing process.  ECF No. 92-11 at 1.  RRD claimed a § 199 deduction for work done for almost all its top 200 clients.  ECF No. 92-15 at 61:23–62:2.  RRD based this decision on an assessment of its business overall rather than its relationship with each customer.  *Id.* at 77:21–78:24 ("We did not ask specific questions for specific customers.").

Plaintiff nevertheless sought the following changes, among others, to its printing contracts:

- Remove language that risk of loss and legal title to the finished work did not pass to Plaintiff until invoicing or shipment.  *See* ECF No. 92-4; ECF No. 97 at 119:24–120:3; ECF No. 95-2 at 22 ¶ 42.

- Remove language stating the work in process was the printer's property and add language stressing that the paper always remained Plaintiff's property.  *See* ECF No. 60 ¶ 240; ECF No. 95-2 at 17 ¶ 30.

- Remove references to "manufacturing" or "producing." *E.g.*, ECF No. 95-2 at 1; ECF No. 97 at 115:19–24.

- Insert language stating Plaintiff was entitled to the § 199 tax deduction.  ECF No. 60 ¶ 238.

The printers removed references to manufacturing and producing.  *Id.* ¶ 243.  Although RRD removed language stating the "work in process and other indirect products of the Work" was and would remain RRD's property, the 2011 contract also stated that "[t]itle of finished and semi-finished Work shall pass to Publisher upon the earlier of Printer's delivery to carrier or Postal Service, or delivery into storage."  *Compare* ECF No. 85-5 at 151 ¶ 54, *with* ECF No. 96-3 at 27 ¶ 42.

Plaintiff had better luck with Brown and Quad.  First, no evidence indicates Brown or Quad claimed the § 199 deduction.  *See* ECF No. 105 at 87:20–24.  The two printers also were both more receptive to Plaintiff's requested contract changes.  *See* ECF No. 60 ¶¶ 241, 243.  Quad, despite some resistance, *see* ECF No. 92-4, agreed to remove the title-passage clause.  *Compare* ECF No. 60 ¶ 241, *and* ECF No. 85-9 at 31 ¶ 41, *with* ECF No. 85-6 at 22 ¶ 42.  Brown even agreed to language stating the two sides intended for Plaintiff to claim the § 199 deduction.[8]  ECF No. 60 ¶ 240.  Whatever language each contract adopted, the day-to-day relationship between Plaintiff and its printers did not change.  ECF No. 97 at 96:18–97:24, 133:20–135:18, 138:12–16; ECF No. 98 at 77:10–19.

---

[8] Schumacher and Howell acknowledged Plaintiff may have had more leverage over Brown because it was a smaller printer that risked losing Plaintiff's business.  *See* ECF No. 97 at 115:23–116:8; ECF No. 98 at 145:5–6.  Although the Court finds this minimally affects the credibility of Brown's assertion that Plaintiff was entitled to a § 199 deduction, the Court also finds it does not affect the credibility of other contract changes.  For instance, Quad a larger printer that rejected Plaintiff's requested § 199 amendment, still removed the title-passage clause at Plaintiff's request.  ECF No. 60 ¶ 241.

Plaintiff claimed a § 199 deduction for its publications in tax years 2006 to 2012.  ECF No. 60 ¶ 186.  The deduction was for $2,269,273 in 2006; $3,855,155 in 2007; $7,564,811 in 2008; $1,797,380 in 2009; $2,833,377 in 2010; $5,913,653 in 2011; and $1,511,571 in 2012.  *Id.* ¶¶ 187–93.

The IRS audited RRD repeatedly.  *See* ECF No. 60 ¶ 307–09; ECF No. 74 at 29:10.  In 2016, the IRS issued Statutory Notices of Deficiency to Plaintiff for the 2006 through 2012 tax years.  ECF No. 60 ¶ 199.  The IRS disallowed Plaintiff's § 199 deductions and assessed additional tax in the amount of $12,164,383.41.  *Id.* ¶¶ 199–200.  On September 21, 2016, Plaintiff paid the additional tax, and the IRS subsequently refunded $1,933.91 in interest for 2010.  *Id.* ¶ 201.  On April 26, 2017, Plaintiff filed claims for a refund of $9,010.829.00 in federal income taxes, $3,151,582.33 of paid-in interest, and statutory interest as allowed.  *Id.* ¶ 202.  After six months passed without IRS action, Plaintiff filed this case and argued it was entitled to the requested refund.  *Id.* ¶ 204.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422.  ECF No. 60 ¶ 1.  This action is timely brought within the period prescribed by 26 U.S.C. § 6532(a)(1).  *Id.*  Venue is proper pursuant to 28 U.S.C. § 1402(a)(2) because Plaintiff's principal place of business is located within this judicial district.  *Id.* ¶ 2.

## II.  CONCLUSIONS OF LAW

### A.  *26 U.S.C. § 199's Legislative History*

The Internal Revenue Code's § 199 provided a tax deduction for "[i]ncome attributable to domestic production activities."  26 U.S.C. § 199 (2005) (repealed 2017).  Congress included the provision in the American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418, in part, because it believed U.S. manufacturers faced "adverse competitive impact" abroad from

foreign tax regimes.  H.R. Rep. No. 108-755, at 275 (2004).  Congress hoped the new income tax deduction would increase domestic manufacturing.  *Id.*

Even so, "a number of firms in other industries benefit[ed]."  Cong. Research Serv., *supra*, at 1.  This was so because § 199's "definition of eligible domestic production activities extend[ed] beyond the manufacturing sector, reducing effective tax rates across a number of economic sectors."  *Id.*  The information sector, which includes publishing, claimed sixteen percent of § 199 deductions in 2013, second only to manufacturing, which claimed sixty-six percent.  *Id.* at 11–12, 12 n.46.

This development hardly was unprecedented.  Congress legislated against a 100-year backdrop of the widely accepted view that one need not be a literal manufacturer to be taxed as one.  The long-accepted proposition is that one can be a manufacturer for a variety of tax positions without being a "manufacturer" in the lay sense.  *E.g.*, *Suzy's Zoo v. Comm'r*, 273 F.3d 875, 879–80 (9th Cir. 2001) (holding a greeting card designer, not its printer, is the owner and producer under 26 U.S.C. § 263A);

Or as the Supreme Court noted when it held a company could not escape an excise tax for manufacturers because it had used subcontractors: "[Congress] did not contemplate that [a] 'person manufacturing' should use his own hands—it contemplated the use of other aid and instrumentalities, machinery, servants, and general agents; . . . and in this comprehensive way, contemplated that all of the world's efficiency might be availed of . . . ."  *Carbon Steel Co. v. Lewellyn*, 251 U.S. 501, 506 (1920); *see also Charles Peckat Mfg. Co. v. Jarecki*, 196 F.2d 849, 851 (7th Cir. 1952) ("[I]t is not unusual in taxing statutes for the term 'manufacturer' to include one who has contracted with others to actually fabricate the product.").  Courts assume Congress is aware of how courts and the IRS interpret its legislation, especially with respect to high-profile

issues.  *Bob Jones Univ. v. United States*, 461 U.S. 574, 600–01 (1983) ("It is hardly conceivable that Congress . . . was not abundantly aware of what was going on.").  Given manufacturing's elevated perch in the nation's economy and politics, the same holds true here.

The § 199 deduction was calculated as a percentage of the lesser of the taxpayer's "qualified production activities income" (QPAI) or "taxable income . . . for the taxable year." § 199(a).  QPAI is "the taxpayer's domestic production gross receipts" (DPGR) for the taxable year, less the cost of goods sold and other expenses allocable to those receipts.  § 199(c)(1). DPGR, in turn, represents the taxpayer's gross receipts "from . . . any lease, rental, license, sale, exchange, or other disposition of . . . qualifying production property [(QPP)] which was manufactured, produced, grown, or extracted [(MPGE)] by the taxpayer in whole or in significant part within the United States."  § 199(c)(4)(A).  In other words, to qualify for a § 199 deduction, a taxpayer must make money from disposing of certain types of property "manufactured, produced, grown, or extracted" in the United States.  *Id.*

The applicable deduction percentage of income was 3% for 2005–2006, 6% for 2007– 2009, and 9% for subsequent years, § 102, 118 Stat. at 1424, until its repeal for tax years beginning after January 1, 2018, Budget Fiscal Year, 2018, Pub. L. No. 115-97, § 13305, 131 Stat. 2054, 2126 (2017).

The parties do not dispute that Plaintiff's physical publications qualify as QPP manufactured within the United States.  *Meredith Corp. v. United States*, 405 F. Supp. 3d 795, 802 (S.D. Iowa 2019).  They also agree that Plaintiff earned gross receipts for the sale of its publications.  *Id.*  Rather, this federal lawsuit is about whether Plaintiff qualifies as the manufacturer of its magazines and is thus entitled to the large tax deduction it claims.

B.   *Treasury Regulations*

Congress directed the Treasury Secretary to promulgate "such regulations as are

necessary to carry out the purposes" of its new deduction.  § 199(d)(7).  The parties agree the

IRS acted within its authority in promulgating the regulations that govern this case.  ECF No.

105 at 84:13–17.

The Secretary's regulations prescribed that only one taxpayer may claim the deduction

for any instance of qualifying activity.  Domestic Production Gross Receipts, 26 C.F.R. § 1.199-

3(f)(1) (2008).  When one party manufactures property "pursuant to a contract with another

party, then only the taxpayer that has the benefits and burdens of ownership of the QPP . . . under

[f]ederal income tax principles *during the period in which the qualifying activity occurs*" can

claim the § 199 deduction for receipts derived from the production of that property.  *Id.*

(emphasis added).  Therefore, in this case, determining whether the contract printers or Plaintiff

had the benefits and burdens of ownership during the period of qualifying activity will determine

whether Plaintiff was entitled to the § 199 deduction.

The Secretary gave two relevant examples to illustrate how the benefits and burdens of

ownership apply in a contract manufacturing situation.

> Example 1.  X designs machines that it uses in its trade or business.  X
> contracts with Y, an unrelated person, for the manufacture of the machines.  The
> contract between X and Y is a fixed-price contract.  The contract specifies that the
> machines will be manufactured in the United States using X's design.  X owns the
> intellectual property attributable to the design and provides it to Y with a restriction
> that Y may only use it during the manufacturing process and has no right to exploit
> the intellectual property.  The contract specifies that Y controls the details of the
> manufacturing process while the machines are being produced; Y bears the risk of
> loss or damage during manufacturing of the machines; and Y has the economic loss
> or gain upon the sale of the machines based on the difference between Y's costs
> and the fixed price.  Y has legal title during the manufacturing process and legal
> title to the machines is not transferred to X until final manufacturing of the
> machines has been completed. Based on all of the facts and circumstances, . . . Y
> has the benefits and burdens of ownership of the machines under Federal income

tax principles during the period the manufacturing occurs and, as a result, Y is treated as the manufacturer of the machines.

Example 2.  X designs and engineers machines that it sells to customers.  X contracts with Y, an unrelated person, for the manufacture of the machines.  The contract between X and Y is a cost-reimbursable type contract.  Assume that X has the benefits and burdens of ownership of the machines under Federal income tax principles during the period the manufacturing occurs except that legal title to the machines is not transferred to X until final manufacturing of the machines is completed.  Based on all of the facts and circumstances, X is treated as the manufacturer of the machines . . . .

§ 1.199-3(f)(4).

The Secretary also suggested magazine publishers could qualify for a § 199 deduction in some circumstances.

A taxpayer's gross receipts that are derived from the lease, rental, license, sale, exchange, or other disposition of newspapers, magazines, telephone directories, periodicals, and other similar printed publications that are MPGE in whole or in significant part within the United States include advertising income from advertisements placed in those media, but only if the gross receipts, if any, derived from the lease, rental, license, sale, exchange, or other disposition of the newspapers, magazines, telephone directories, or periodicals are (or would be) DPGR.

§ 1.199-3(i)(5)(ii) ex. 5.  This rule regarding the scope of a publisher's gross receipts becomes rather pointless unless *some* publisher could have claimed the deduction.

In sum, the Treasury regulations show that a product's designer—rather than a manufacturer—can claim a § 199 deduction but must have (1) the benefits and burdens of ownership (2) during the MPGE period.  Neither Congress nor the Secretary defined those terms.  The Court now attempts to do so.

C.  *The MPGE Period Includes the Physical Production of Publications.*

The parties dispute whether the § 199 qualifying MPGE period included only the printing process or the entire publishing process, including the production of editorial content.  The

answer will inform the benefits and burdens analysis and, thus, the Court must resolve it first. *See Meredith Corp.*, 405 F. Supp. 3d at 804–05.

MPGE activity is activity that results in QPP.  *See* § 199(c)(4)(A).  QPP is "tangible personal property."  § 1.199-3(j)(1).  Tangible property does not include "property in a form other than in a tangible medium."  § 1.199-3(j)(2)(iii).  For example, "mass-produced books are tangible personal property, but . . . the rights to the underlying manuscript [and] an online version of the book" are not*. Id.*  Treasury regulations buttress the requirement that MPGE result in the physical production of a physical object.  "MPGE includes manufacturing, producing, growing, extracting, installing, developing, improving, and creating QPP; making QPP out of scrap, salvage, or junk material as well as from new or raw material by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles . . . ."  § 1.199-3(e)(1).  These words all suggest MPGE is limited to the use of physical force to manipulate physical objects.  *See, e.g.*, *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) (quoting *Massachusetts v. Morash*, 490 U.S. 107, 114–15 (1989)) ("The traditional canon of construction, *noscitur a sociis*, dictates that 'words grouped in a list should be given related meaning.'").

Another well-worn canon of construction is that "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied."  *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980).  Here, Congress made clear that only certain activities that do not produce QPP can rest on their own bottom as MPGE.  Congress limited this exception to the creation of computer software and sound recordings.  § 199(c)(5).  In sum, production of intangible property prior to printing generally does not qualify as MPGE.

To be sure, work that does not create QPP can qualify as MPGE when (1) that work is related to the QPP, and (2) the taxpayer already has the benefits and burdens of ownership during the MPGE of that QPP.  *E.g.*, § 1.199-3(i)(5)(ii).  Although the reasoning is somewhat circular, the Treasury regulations give the example of a taxpayer that manufactures the QPP but also conducts "materials analysis and selection, subcontractor inspections and qualifications, testing of component parts, assisting customers in their review and approval of the QPP, routine production inspections, product documentation, diagnosis and correction of system failure, and packaging for shipment to customers."  § 1.199-3(e)(5) ex. 5.  "Because [the taxpayer] MPGE the QPP, these activities performed by [the taxpayer] are part of the MPGE of the QPP," too.  *Id.*

The IRS's chief counsel explored how Example 5 would apply to the publishing industry in a memorandum to the agency's litigators.  Mfg., Prod., Growth, Extraction of Qualifying Prod. Property & Section 199, Op. Chief Counsel IRS No. 201313020 at 2 (2013) [hereinafter IRS Chief Counsel Op.], https://www.irs.gov/pub/irs-wd/1313020.pdf.  The chief counsel concluded that the preprinting production of a book did not qualify as MPGE when the publisher did not have the benefits and burdens of ownership during the actual printing.  *Id.* at 6.  "The contract manufacturer's activities are the activities that constitute the MPGE of QPP (i.e. mass-produced books).  Therefore, . . . Taxpayer's activities are not treated as part of the MPGE of QPP because Taxpayer did not MPGE the QPP."  *Id.* at 5–6.

So too here.  Although Plaintiff's content creation and preprint processes create valuable assets, the Court concludes that these constitute intangible property until the physical printing process begins.  As intangible property, they are not QPP.  Thus, the Court does not consider content creation in assessing if Plaintiff had the benefits and burdens of ownership during the MPGE period.  *See Meredith Corp.*, 405 F. Supp. 3d at 804–05.  However, this does not make

the possible extension of the MPGE period pointless.  If Plaintiff has the benefits and burdens of ownership during its publications' physical production, the MPGE would include certain prepress activities and increase Plaintiff's deduction.  *See id.* at 805; *see also* § 1.199-3(i)(5)(ii) (noting gross receipts from print media that are MPGE in the United States "include advertising income from advertisements placed in those media, but only if the gross receipts, if any, derived from the lease, rental, license, sale, exchange, or other disposition of the newspapers, magazines, telephone directories, or periodicals are (or would be) DPGR"); § 1.199-3(e)(5) ex. 5.

In other words, Plaintiff is correct that its preproduction activities can count as part of the MPGE period, but this is so only if it MPGE its publications.  Plaintiff thus is either right about both the benefits and burdens of ownership and the extent of the production period or neither.  For these reasons, the Court does not consider Plaintiff's preproduction editorial activities as part of the MPGE period at this juncture because it does not independently result in QPP.  The dispositive issue thus is whether Plaintiff had the benefits and burdens of ownership of the physical magazines while they were being physically produced.

### D.  *Benefits and Burdens of Ownership*

Who has the benefits and burdens of ownership is a "question of fact to be determined by reference to the written agreements and the attendant facts and circumstances."  *Upham v. Comm'r*, 923 F.2d 1328, 1334 (8th Cir. 1991).  Here, answering that question of fact also requires resolving several disputed issues of law.  The Eighth Circuit has found the following factors appropriate to consider:

> (1) [w]hether legal title passes; (2) the manner in which the parties [to the contract] treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property.

*Id.* (quoting *Houchins v. Comm'r*, 79 T.C. 570, 591 (1982)).  Courts often attribute these factors to *Grodt & McKay Realty, Inc. v. Comm'r*, 77 T.C. 1221, 1237–38 (1981).  *E.g.*, *ADVO, Inc. v. Comm'r*, 141 T.C. 298, 324, 324, 327 (2013) (discussing the *Grodt* factors).

These factors are not exclusive.  *Id.* at 325 n.21.  For instance, with respect to the sale of a movie, the Eighth Circuit also held no sale occurs unless the negative and "all substantial rights accompanying a movie copyright" are transferred.  *Upham*, 923 F.2d at 1334.  In *ADVO*, another § 199 case involving the printing industry, the Tax Court also considered "whether [the taxpayer] actively and extensively participated in the management and operations of the activity."  141 T.C. at 325.

No factor is dispositive.  Courts and the Treasury repeatedly have rejected suggestions that bare title, risk of loss, or control over the manufacturing process are either necessary or sufficient to establish the benefits and burdens of ownership.  *E.g.*, *Bailey v. Comm'r*, 912 F.2d 44, 47 (2d Cir.1990) (holding that "ownership of an asset for tax purposes is to be based on an analysis of many different factors indicative of ownership, not always on the bare legal title"); *Upham*, 923 F.2d at 1334 (same); § 1.199-3(f)(4) (same).  In fact, in the context of publishing, the IRS's chief counsel acknowledged that a publisher can still have the benefits and burdens of ownership during the MPGE period even when a contract printer performs the printing.  *See* IRS Chief Counsel Op., *supra*, at 5, 6 n.2 (acknowledging the Chief Counsel's "conclusion would change if [the publisher] has the benefits and burdens of ownership during the period in which" the physical books are produced by a contract printer).

The Court thus concludes the following indicia of ownership during the production process are relevant here: (1) who holds legal title; (2) the contracting parties' intent; (3) who holds equity in the publications; (4) who exerts more control over the publications, including but

not limited to the right of possession and who actively participated in management of activity; (5) who bears the risk of loss; (6) who receives the profits or other benefits from the disposition of the property; (7) who maintains ownership of the underlying rights in the publications; and (8) who pays property taxes.[9]

"Often both parties to a contract manufacturing arrangement have some of the indicia of benefits and burdens" of ownership.  I.R.S. Dir. LB & I–04–0713–006 at 2 (July 24, 2013).  As the IRS acknowledged, and the Court does not dispute, "it may be difficult to determine which party may claim the [§] 199 deduction with respect to the same economic activity."[10]  *Id.*  The Court thus will discuss each factor in turn.

### 1. Title

Holding legal title is one benefit of ownership.  *See Upham*, 923 F.2d at 1334.  In *ADVO*, legal title cut in the government's favor because the printing contracts "clearly state[d] that 'Title to and risk of loss' of the product (i.e. the printed material) d[id] not transfer to ADVO until the products ha[d] left the printers' facilities."  141 T.C. at 326.

Here, almost all contracts state the finished work's legal title does not pass to Plaintiff until the printer issued a final invoice for its work or shipped the publications, whichever occurred first.  ECF No. 96-3 at 27 ¶ 44; ECF No. 85-2 at 29 ¶ 44; *see also* ECF No. 85-5 at 151 ¶ 54 ("Title of finished and semi-finished Work shall pass to Publisher upon earlier of Printer's delivery to carrier or Postal Service, or delivery into storage . . . ."); ECF No. 85-6 at 22 ¶ 42

---

[9] The Court accepts the *ADVO* court's conclusion that certain traditional indicia of ownership lack relevance under § 199, such as "whether the contract creates a present obligation on the seller to execute and deliver a deed."  141 T.C. at 324, 327.

[10] Indeed, the difficulty in assessing which party to a manufacturing contract was entitled to the § 199 deduction appears to be one reason Congress repealed it.  *See* Cong. Research Serv. *supra*, at 11 (noting § 199 audits "may stress limited enforcement resources for the IRS").

("Title and possession of finished Work shall pass to Publisher upon the earlier of delivery to carrier or Postal Service or date of final invoicing, f.o.b. Printer's plant.").  Such language is unambiguous as to who holds legal title and when.

Plaintiff nevertheless argues that if the Court focuses on the contracts' substance, rather than form, it is clear that legal title in the finished work always belonged to Plaintiff.  Indeed, the Supreme Court repeatedly has "observed that 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed.'" *Frank Lyon Co. v. United States*, 435 U.S. 561, 572 (1978) (quoting *Corliss v. Bowers*, 281 U.S. 376, 378 (1930)).  Or, to put a finer point on it, "[t]he Court has never regarded 'the simple expedient of drawing up papers[]' as controlling for tax purposes when the objective economic realities are to the contrary." *Id.* at 573 (quoting *Comm'r v. Tower*, 327 U.S. 280, 291 (1946)).  But the substance-over-form doctrine stems from cases in which a taxpayer tried to hide behind a hollow contract to escape his or her true tax liability.  *E.g.*, *id.* at 572–73 (collecting cases).  By contrast, in *Frank Lyon Co.*, the Court accepted the taxpayer's arguments regarding the transaction's substance but did so because those arguments complimented the contract's form.  *Id.* at 580–81.

Rather, "[w]hen it is the taxpayer who attempts to disavow his own transaction, he 'may have less freedom than the Commissioner to ignore the transactional form that he has adopted.'" *Estate of Juden v. Comm'r*, 865 F.2d 960, 962 (8th Cir. 1989) (quoting *Bolger v. Comm'r*, 59 T.C. 760, 767 n.4 (1973)); *see also Coca-Cola Co. v. Comm'r*, 369 F.2d 913, 917–18 (8th Cir. 1966) (quoting *Hamlin's Tr. v. Comm'r*, 209 F.2d 761, 765 (10th Cir. 1954)) ("[W]here parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences.").  For "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the

tax consequences of his choice, whether contemplated or not." *Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974).  In other words, although the IRS can pierce corporate formalities to find taxes owed, it need not do the same to find taxes that should be refunded.  *See Bennett Paper Corp. & Subsidiaries v. Comm'r*, 699 F.2d 450, 451–52 (8th Cir. 1983).  "[T]he taxpayers are bound by the consequences of the transaction as structured, even if hindsight reveals a more favorable tax treatment."  *Estate of Bean v. Comm'r*, 268 F.3d 553, 557 (8th Cir. 2001) (citing *Grojean v. Comm'r*, 248 F.3d 572, 576 (7th Cir. 2001)).

"Although this approach may seem a harsh and technical one, . . . it is the correct one." *John Allan Love Charitable Found. v. United States*, 710 F.2d 1316, 1321 (8th Cir. 1983).  Tax enforcement would face gridlock if every taxpayer could come to court and argue an unambiguous contract he or she voluntarily signed does not mean what it plainly says.[11]

Therefore, in this case, the title factor favors the Government for most of the tax years at issue because the contracts' plain terms stated title did not pass to Plaintiff until after the manufacturing process was completed.

To be sure, these title-passage clauses create tension with other provisions of the contract that suggest the paper on which the printers printed remained Plaintiff's property throughout

---

[11] To be sure, some older Eighth Circuit precedent suggests a taxpayer can escape the tax consequences of a contract if the record "does not establish that taxpayers ever agreed upon the tax treatment to be afforded either party to annual payments called for by the contract."  *Leisure Dynamics, Inc. v. Comm'r*, 494 F.2d 1340, 1347 (8th Cir. 1974).  Although no Eighth Circuit panel has addressed the matter, the Court is unable to reconcile *Leisure Dynamics* with *National Alfalfa* and other Circuit precedent discussed above.  It is well understood that circuit precedent loses its binding force when "an intervening expression of the Supreme Court is inconsistent with those previous opinions."  *Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000).  And regardless, to the extent *Leisure Dynamics* still governs, it would have minimal effect here.  While the parties stipulate that Plaintiff did not have contract negotiations regarding the § 199 deduction in 2005 and 2006, ECF No. 60 ¶ 22, the parties stipulate that such negotiations began by 2008, *id.* ¶ 237.

production.  *E.g.*, ECF No. 85-5 at 147 ¶ 42 (stating that "all paper stored by Printer for Publisher [is] and shall remain the sole property of Publisher" in the 2011 contract with RRD); ECF No. 85-6 at 22 ¶ 40 (stating that "all copies of the Magainze(s) and all paper stored by Printer for Publisher [is] and shall remain the sole property of Publisher" in the 2006 contract with Quad).  Nevertheless, the Court concludes such tension is better assessed under other benefits and burdens of ownership, such as intent, rather than title-passage.  For even if the approach seems "harsh," the Court must give weight to the contract as it is written, not as it could have been—or perhaps should have been—written.  *John Allan Love Charitable Found.*, 710 F.2d at 1321.  Legal title thus favors the Government on all contracts until 2011.

However, once Plaintiff "arranged the transaction differently" and removed title-passage clauses from its printing contracts, the calculus changes.  *Id.*  The 2011 Brown agreement and the 2012 Quad agreement lack title-passage clauses.  ECF No. 60 ¶ 241.  Those provisions were replaced with clauses governing the printer's duty of care and Plaintiff's duty to pay.  *Id.*; *see also* ECF No. 85-9 at 31 ¶ 42 ; ECF No. 85-12 at 37–38 ¶ 12.2.  Furthermore, for reasons discussed below, the contracts without these clauses were not disconnected from the "objective economic realities of [the] transaction."  *Frank Lyon Co.*, 435 U.S. at 573.  Therefore, the legal title factor cuts in Plaintiff's favor beginning in 2011 with Brown and 2012 with Quad.

2.   How the Contracting Parties Treat the Transaction

The Court must also consider "the manner in which the [contracting] parties treat the transaction."  *Upham*, 923 F.2d at 1334.  For this factor, the transaction's substance and the contracting parties' intent matters more than the transaction's label.  *See ADVO*, 141 T.C. at 326 (citing *Oesterreich v. Comm'r*, 226 F.2d 798, 801–02 (9th Cir. 1955)).  Although a contract's language remains probative, courts also look to the contracting parties' expressed concerns

during negotiations, the nature of payments, industry custom, the contracting parties' actions, and the agreement's context. *See Oesterreich*, 226 F.2d at 803, *cited with approval in ADVO*, 141 T.C. at 326, *and Grodt*, 77 T.C. at 1238–39. These indicators all appear well before either contracting party prepares its taxes. *See Oesterreich*, 226 F.2d at 803; *Grodt*, 77 T.C. at 1238; *Houchins*, 79 T.C. at 591.

Treasury regulations, *ADVO*, and the parties suggest the main issue here is whether Plaintiff and the printers treated the transaction as a sale or a service. If the former, the intent factor cuts in the Government's favor because a sale implies the printers owned the QPP during MPGE and had to sell it to Plaintiff before Plaintiff could sell it to readers. If the latter, the factor cuts in Plaintiff's favor because a service suggests the printers merely performed its printing and binding services on Plaintiff's property. *See* Income Attributable to Domestic Production Activities, 70 Fed Reg. 67220, 67228–29 (proposed Nov. 4, 2005); *see also ADVO*, 141 T.C. at 326–27 (contrasting ADVO's argument that printers merely provided a service with the reality that printers "produce[d] the actual tangible property"). In *ADVO*, the Tax Court found how the parties treated the transaction favored the government because the agreement showed the parties intended the printers to produce all tangible materials based on ADVO's "intangible pre-press materials." 141 T.C. at 327.

Therefore, the Court looks to the contracts' text, the witnesses' testimony, and, to help resolve any lingering ambiguity, industry custom to assess whether Plaintiff and its printers treated the transaction as a sale or service.[12]

---

[12] The Government repeatedly objected to the admission of any "parol evidence offered . . . to prove that the pre-2011 printing agreements were not sales in which title to the tangible copies unambiguously passed from the printers to [Plaintiff]." *E.g.*, ECF No. 40 at 20. That argument is misplaced. First, as mentioned above and discussed further below, the contracts are not so unambiguous. Second, assessing how the contracting parties treated a transaction

a.   Contract Text

The contract language does not resolve the Plaintiff's or its printers' respective intents because it contains hallmarks of both a sale and a service.  On the service side, each contract stated the printers provided Plaintiff with services, albeit to varying degrees.  *E.g.*, ECF No. 96-3 at 1 ¶ 2, 3 ¶ 6, 10 ¶ 15.1; ECF No. 85-5 at 125 ¶ 6, 131 ¶ 13; ECF No. 85-9 at 10 ¶ 1; ECF No. 85-12 at 22.  Even so, no contract stated the printers sold Plaintiff anything.  Indeed, when Maki, RRD's head of tax since 2008, was asked where a contract described the transaction as a sale, she could not find an example.  ECF No. 92-15 at 69:14–70:25.[13]  The invoices' lack of sales taxes further cuts against a sale.[14]  *See* ECF Nos. 87-7, 87-12, 87-13.

And although a title-passage clause suggests a sale, it is not sufficient to establish that a contract's parties treated the transaction as one.  *Oesterreich*, 226 F.2d at 802–03.  Otherwise, courts assessing the benefits and burdens of ownership would have no need to address both factors separately.  *See, e.g.*, *ADVO*, 141 T.C. at 325–26.  Nor did the Secretary encourage collapsing title-passage and intent into a single indicium of ownership.  In promulgating final regulations, the Treasury rejected suggestions to make certain contract terms dispositive as to

---

necessarily requires looking beyond the contract's text.  *See Oesterreich*, 226 F.2d at 803.  Although the written agreements are indeed probative, they are not dispositive.  Finally, even "integrated . . . agreements are to be read in the light of the circumstances and may be explained or supplemented by operative usage of trade, by the course of dealing between the parties, and by the course of performance of the agreement."  Restatement (Second) of Contracts § 209 cmt. a (Am. Law Inst. 1991).  Here, "neither [Plaintiff] nor this Court is attempting to vary the terms of the written agreement; we are simply trying to determine the tax consequences that flow from the agreement[s] entered into by [Plaintiff and the printers]."  *Strutzel v. Comm'r*, 60 T.C. 969, 976 (1973) (holding that a written agreement constituted a sale, not a lease).

[13] Maki acknowledged the contract's reference to a "sale date" referred to when the magazine went on sale to readers.  ECF No. 92-15 at 70:14–18.

[14] In *Suzy's Zoo*, which involved a different manufacturing tax provision, the Ninth Circuit noted the absence of collected sales taxes in holding a greeting card's designer, not the printer, maintained ownership.  273 F.3d at 877 n.2.

§ 199 eligibility.  *See* Income Attributable to Domestic Production Activities, 70 Fed Reg.

67220, 67228 (proposed Nov. 4, 2005) (rejecting suggestions to replace the benefits and burdens

standard with simpler alternatives, such as "looking to the person that has the economic risks and

benefits, . . . providing safe harbors based on contract terms, treating the person that arranges for

the acquisition of the property as the owner, [or] looking to the person that controls the process

by which the property is MPGE"); Income Attributable to Domestic Production Activities, 71

Fed. Reg. 31268, 31272 (June 1, 2006) (stating "[t]he IRS and Treasury Department continue to

believe that the benefits and burdens of ownership must be determined based on all of the facts

and circumstances").

     Nor is this textual theory as iron-clad as the Government suggests.  For instance, the

Government's sale theory conflicts with contract language stating the "work in process and *other*

*indirect products of* the Work made by printer will be used solely for Publisher's Work but *will*

*remain* Printer's property."  ECF No. 96-3 at 27 ¶ 42 (emphasis added).  The contracts did not

define "work in process."  The Government argues the term described the printed, unbound

pages of the magazine, including the paper on which they were printed.  *E.g.*, ECF No. 100 at 17.

In other words, the Government argues the printers, for a brief time, took ownership of Plaintiff's

paper and then sold it back to Plaintiff as part of the "work in process," which the pre-2011

contracts stated the printers owned.

     But any "work in process" interpretation that includes Plaintiff's paper—and thus

demarcates a sale—clashes with several provisions that state Plaintiff-supplied materials,

including "all paper stored by Printer for Publisher are and *shall remain* the sole property of

[Plaintiff]."[15]  *E.g.*, ECF No. 96-3 at 27 ¶ 42 (emphasis added).  It seems implausible for Plaintiff's paper to remain its property while also belonging to the printers as part of the work in process.  The Court hesitates to read the contract in a way that disregards the specific language about paper in favor of the vague term "work in process."  *See Am. Fed'n of State, Cty. and Mun. Employees v. State Labor Relations Bd.*, 653 N.E.2d 1357, 1364 (Ill. App. Ct. 1995) ("[I]n construing a contract, courts must give effect to the more specific clause and, in so doing, should qualify or reject the more general clause as the specific clause makes necessary."); *see also* 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.23 (Joseph M. Perillo ed. 1998).  At the very least, the Court needs extrinsic evidence to resolve how the contracts' parties treated the transaction given the ambiguous contract text.  *See* Restatement (Second) of Contracts § 203(a) (Am. Law Inst. 1991) (stating "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part . . . of no effect").

b.  Trial Testimony

The trial testimony shows the contracts' parties treated the transactions more as service agreements than sales because even the printers believed Plaintiff maintained ownership of its paper during the entire production process and that title passage served functions other than demarcating a sale.

First, every witness to testify on the matter said that Plaintiff owned the paper the entire time it was in the printers' possession.  ECF No. 98 at 29:23–30:11, 71:12–17, 79:20–21; ECF No. 97 at 104:12–17, 105:6–9; ECF No. 92-15 at 48:1–4, 95:14–16, 96:4–7.  It also is telling that the printers had to purchase paper from Plaintiff to use that paper for other clients yet made no

---

[15] The undisputed fact white paper waste from the beginning and end of a paper roll—the amount of which cannot be predetermined—remains Plaintiff's property also suggests the *entire* roll always belonged to Plaintiff.  *See* ECF No. 90-7 at 30; ECF No. 99 at 102:12–104:7.

such payments for Plaintiff's publications.  ECF No. 60 ¶ 74; ECF No. 97 at 259:19–23.  Such

testimony suggests Plaintiff and its printers did not treat the work in process clause as giving

printers free and temporary ownership of Plaintiff's paper.[16]  Not that the "work in process"

clause appeared to have too much meaning to Plaintiff or its printers.  After negotiators removed

it from the 2011 contract, there was "no change" to the Plaintiff-RRD relationship.  ECF No. 98

at 77:10–19.  Because both the printers and Plaintiff acted as if Plaintiff always owned the paper,

it appears more likely the contracts' parties treated the transaction as a service.

Second, the witnesses' equivocal and shifting answers as to the title-passage clause's

significance weakened the Government's argument that the clause clearly signified a sale.  On

direct, Waggoner testified that the contracts' title-passage language "from a personal standpoint,

. . . was always [about] responsibility for the product."[17]  ECF No. 98 at 31:4–5.  And Maki

testified the title-passage clause was used to demarcate when to collect revenue under generally

accepted accounting principles.  ECF No. 92-15 at 92:3–10; *see also* ECF No. 60 ¶ 311.  On a

follow-up question, she clarified the title-passage clause also indicated who bore the risk of loss

and to signify that "title has passed," without elaborating.  ECF No. 92-15 at 94:15–25.

The evidence also suggests the title-passage clause did not clearly demarcate a sale

because after other printers agreed to remove it from later contracts, nothing changed in their

relationship with Plaintiff.[18]  ECF No. 97 at 97:1–24; *but see* ECF No. 98 at 49:13–20 (showing

---

[16] To the extent Waggoner and Maki suggested otherwise during later testimony, the Court found this testimony less credible.  *See supra* 8 n.3

[17] Not that the title passage clause was in the front of Waggoner's mind.  He testified that these clauses were carried over from previous contracts as a matter of course.  ECF No. 98 at 14:12–18.

[18] Plaintiff had more leverage over Brown, a smaller printer, in contract negotiations, *see* ECF No. 97 at 116:5–8, making it more likely Brown would agree to its demands.  However, Quad a larger printer that rejected some of Plaintiff's § 199-related contract changes, still removed the title-passage clause.  *Id.* at 118:3–120:3.

RRD refused Plaintiff's request to remove the title-passage clause).  One would expect otherwise if the language governed whether the printers were selling Plaintiff a physical good or merely performing a service.  In sum, the fact neither Plaintiff nor the printers acted as if the title-passage clause governed the nature of their relationship weakens the Government's argument that they intended the clause to establish a sale.

Third, the Court finds testimony that both the printers and Plaintiff believed they held the benefits and burdens of ownership under tax law carries less weight in assessing how they treated the transaction.  This is so because "the parties' desire to achieve a particular tax result [is not] necessarily relevant" in determining the correct tax result.  *Frank Lyon Co.*, 435 U.S. at 573 (citing *Comm'r v. Duberstein*, 363 U.S. 278, 286 (1960)).  Furthermore, it is not obvious why RRD's belief that it could claim the deduction, *see* ECF No. 92-11,[19] deserves any more weight than Plaintiff's belief to the contrary or other printers' decisions to not claim the deduction.[20]

Lastly, even if intent to claim a tax deduction was the intent at issue, the Government did not present much evidence specific to how RRD treated its relationship with Plaintiff, its thirteenth largest customer by sales.  ECF No. 92-15 at 41:16–42:2.  For instance, RRD claimed

---

[19] The Court concludes RRD's letter to the IRS is admissible on two fronts despite Plaintiff's hearsay objection.  First, the Court concludes the letter is not hearsay because it shows RRD's intent with respect to tax law, regardless of the truth of RRD's legal conclusions.  *See* Fed. R. Evid. 801(c).  Second, to the extent the letter contains hearsay, such hearsay is admissible as a business record because it was produced in an RRD tax employee's ordinary course of business in responding to an IRS audit.  ECF No. 92-15 at 32:2–23; *see also* Fed. R. Evid 803(6).  It also is presumably trustworthy given the penalties RRD would face in lying to the IRS.  Nevertheless, the Court gives the document limited weight with respect to how the parties treated the transaction.  This is so because the Court is more concerned with how the parties treated the transaction during its execution, not during income tax season.  And as Maki testified, RRD's and Plaintiff's negotiators can better answer that question because "they agree to the words in a contract that will describe ownership," ECF No. 92-15 at 26:8–11, and are "more focused on how is the relationship going to work," *id.* at 27:1–2.

[20] The Court finds the lack of evidence that Brown or Quad claimed a § 199 deduction conclusive given the Government's unique purview over such matters.

a § 199 deduction for work done for almost all its top 200 clients.  *Id.* at 61:23–62:2.  Yet RRD acknowledged this decision was based on a general assessment of its work rather than an assessment of its relationship with each customer.  *Id.* at 77:21–78:24.  This weakens the Government's argument that RRD formed a clear intent as to its tax relationship with Plaintiff. For these reasons, the trial testimony more strongly suggests Plaintiff and its printers treated the contracts as service agreements, not sales.

> c.  Industry Custom

To resolve any lingering ambiguity in how Plaintiff and its printers treated the transaction, the Court examines the documents and testimony in light of industry custom. Although such evidence cannot rewrite a contract's express terms, it nevertheless helps discern the contracting parties' intent when the documents and testimony contain vague and contradictory assertions.  Here, Plaintiff provided unrebutted evidence that it would run contrary to industry custom for Plaintiff to forego ownership of millions of dollars in paper—even for a brief time—while the printer performs its services.  ECF No. 99 at 55:11–57:18.

This custom also is in accord with Illinois and New York law, which governed the contracts at issue.  ECF No. 60 ¶ 17.  In both states, printing on and binding of customer-supplied paper generally is a service not a sale.  *Wm. H. Wise & Co. v. Rand McNally & Co.*, 195 F. Supp. 621, 625, 628 (S.D.N.Y. 1961); *Time, Inc. v. Hulman*, 201 N.E.2d 374, 377 (Ill. 1964). This follows the general rule that "[w]here the person ordering the manufacture, supplies the bulk of the materials used in the completion of production, it is generally a work, labor and materials contract and not a sale." [21]  *Wise*, 195 F. Supp. at 625.

---

[21] Under the doctrine of accession, "where one party adds or attaches some of his property to the property of another, so that the other's property is preponderant, the latter obtains title to the whole."  *Wise*, 195 F. Supp. at 628.

In *Wise*, which was not a tax case, the publisher contracted with a printer for book production. *Id.* at 623. The parties' "contract appear[ed] on the face of a standard purchase order in which various terms of sale [we]re employed." *Id.* at 626 n.5. Yet the publisher "furnished the bulk of the materials to be used in production." *Id.* For instance, the publisher supplied the paper, while the printer supplied the printing and binding material. *See id.* at 623, 626. The court concluded that the "essence" of such an arrangement was "one of service. *Id.* at 626. "The contract was one of work, labor[,] and materials and not one of sale." *Id.*

Meanwhile, a series of Illinois decisions known as the "Graphic Arts Cases" stand for the proposition that commercial printers perform a service for publishers and do not "sell" them furnished magazines. *See Time, Inc.*, 201 N.E.2d at 376–77 (collecting cases); *see also H.G. Adair Printing Co. v. Ames*, 4 N.E.2d 481, 481 (Ill. 1936) (finding that the printed material "is of no use or value to any person other than the one for whom the printing is done . . . , and it follows that the printer is engaged only in service"). By contrast, a sale—or transfer of ownership—does occur when the publisher distributes the magazine to a subscriber.[22] *Time, Inc.*, 201 N.E.2d at 377.

Both cases apply here. As in *Wise*, Plaintiff supplied the paper, "the bulk of the materials to be used," while its printers supplied other printing and binding materials. 195 F. Supp. at 626. Under *Wise*, which interpreted New York law, *id.* at 628, this suggests a contract "of work, labor[,] and materials and not one of sale," *id.* at 626. And as in *H.G. Adair Printing Co.*, the printers' work for Plaintiff had "no value to any person other than" Plaintiff because the printers

---

[22] The Court rejects the Government's alternative theory that the printing contracts represented buyer-financed agreements because the Government presented no evidence that Plaintiff and its printers believed they engaged in such a transaction and no evidence that such arrangements were common in the printing industry, much less in Illinois or New York.

could not sell the magazines as they saw fit.  4 N.E.2d at 481.  Thus, under Illinois law as applied

to the printing industry, "it follows that the printer [was] engaged only in service."  *Id.*

Therefore, because of Plaintiff's unrebutted expert testimony as to trade custom that is in

harmony with the contracts' governing law, the printing industry's customs further suggest

Plaintiff and its printers treated their arrangement as one of service.

In sum, because of the contracts' ambiguity; the printers' belief that Plaintiff owned the

paper during the entire printing process; and trade customs with respect to client-supplied paper

and printing services, the Court finds Plaintiff and its printers more closely treated their

transactions ones for services than sales.  The intent factor thus favors Plaintiff.

3.   Equity in the Property

The Court must next consider who had equity in the property during printing.[23]  *See*

*Upham*, 923 F.2d at 1334.  In tax cases, equity constitutes an ownership interest "in the property

which the purchaser could not prudently abandon."  *Estate of Franklin v. Comm'r*, 544 F.2d

1045, 1048 (9th Cir. 1976).  In other words, if the taxpayer "abandon[s] the transaction[,]" what

does the taxpayer lose?  *See id.*  When a taxpayer "could not have economically sustained the

loss" that would accompany such abandonment, courts often find that taxpayer has equity in the

property at issue.  *Haggard v. Comm'r*, 241 F.2d 288, 289 (9th Cir. 1956).

In *Estate of Franklin* the taxpayers claimed they purchased an Arizona motel for more

than $1.2 million—far more than it was worth—and sought depreciation deductions.  544 F.2d at

1046, 1048 n.4.  And, indeed, the motel's owners agreed to "sell" for that price and to allow the

taxpayer to make payments over ten years after an initial "prepaid interest" payment.  *Id.* at

---

[23] The *ADVO* court did not assess the equity factor but allowed it may be relevant in other
§ 199 cases.  141 T.C. at 327.

1046.  But rather than make those monthly payments, the taxpayers leased back the motel to the putative sellers and set lease payments to cancel out the taxpayers' scheduled payments.  *Id.* at 1047.  This meant that no cash changed hands, and the original owners continued to effectively run the property while the taxpayers claimed a deduction.  *See id.*  In other words, the "sale" was a sham.

The Ninth Circuit held that so long as the taxpayers' outstanding balance exceeded the motel's value, any payments—real or theoretical—did not purchase any equity in the property.  *Id.* at 1048.  Rather, "[u]nder these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future."  *Id.*  In other words, walking away from the transaction forfeited no ownership stake.

That is not the case here.  Plaintiff had the dominant equity in its publications during printing because they had the most to lose if they abandoned the transaction: millions of dollars of paper they still owned.  This is so because Plaintiff made a greater investment in the QPP's physical inputs.

For fiscal year 2008, Plaintiff provided $46,637,711 worth of paper to RRD.  ECF No. 60 ¶ 174.  Under no circumstances would it be financially prudent for Plaintiff to cut ties with RRD and forfeit that much paper.  By contrast, RRD invested $10,191,872 in ink, polybag, binding materials and other physical supplies.  *Id.*  While it would still be imprudent for RRD to forfeit such an investment, it was a less daunting proposition than the one Plaintiff faced.[24]

---

[24] Even if the Court includes the cost of labor—production costs for RRD and quality control for Plaintiff—the totals show RRD made less of an investment in the QPP.  *See* ECF No. 60 ¶ 174.  And RRD's labor cost is at least somewhat inflated here because it appears to include shipping activities undertaken by RRD, *id.*, which do not constitute MPGE and occurs outside the qualifying period.  *ADVO*, 141 T.C. at 330.

The Government's response is two-fold.  First, the title-passage clause stripped Plaintiff of whatever equity it had in its paper during the printing process.  But nowhere does the contract explain that the paper becomes the printers'—at no cost—once ink touches the paper.

Second, the Government argues that the printers had the dominant equity interest because they had inherent equity through manufacturing the magazines.  ECF No. 100 at 28 ¶ 102.  But the printers did not make the magazines from whole cloth.  Rather they painted upon a canvas—and a rather expensive one—provided by Plaintiff.  The weight of the evidence—the contracts' text, the witnesses' testimony, and industry custom discussed *supra*—all indicate Plaintiff never forfeited that equity nor could it reasonably have been expected to do so.  The equity factor thus cuts in Plaintiff's favor.[25]

4.  Control

The Court must also consider Plaintiff and its printers "control over the property and, if so, the extent of such control" during the printing process.  *Upham*, 923 F.2d at 1334.  Control includes which party has the right to possession.  *See Grodt*, 77 T.C. at 1241.  Courts assessing control in the manufacturing context have focused on several additional indicia.  For instance, Treasury regulations state that control cuts in the contract manufacturer's favor when "[t]he contract specifies that [the contract manufacturer] controls the details of the manufacturing

---

[25] As Plaintiff notes, the printers lack of equity in the QPP also is evidenced by the contracts' prohibition of the printers selling, leasing, or allowing any liens or encumbrances on the "property of [Plaintiff] in Printer's possession, including, without limitation, paper supplied by [Plaintiff]."  ECF No. 96-3 at 27 ¶ 42.1.

process while the [products] are being produced," even if the manufacturer is using the taxpayer's design under copyright restrictions.  § 1.199-3(f)(4) ex. 1.

Furthermore, the Treasury's early § 199 guidance suggests that courts should look to control principles from two other sections of the tax code: § 263A and § 936.[26]  *ADVO*, 141 T.C. at 317.  With § 263A, the Tax Court and the Ninth Circuit agreed a greeting card designer— rather than the contract printer—was the true owner of the greeting cards for tax purposes because the printer lacked independence and was subject to "close scrutiny[] and approval" by the designer.  *Suzy's Zoo*, 114 T.C. 1, 8 (2000), *aff'd*, 273 F.3d 875.  More specifically, the Tax Court found that the designer's printer selection and control over specifications favored the card designer.  *Id.*  In affirming, the Ninth Circuit concluded the designer's "degree of control it exercise[d] over the manufacturing process" made it the cards' owner from the first stage of production.[27]  273 F.3d at 880.

By contrast, § 936 has a less obvious connection to contract manufacturing.  Congress enacted § 936 to benefit American companies operating in U.S. possessions, such as Puerto Rico.  *Medchem (P.R.), Inc. v. Comm'r*, 116 T.C. 308, 333 (2001), *aff'd*, 295 F.3d 118 (1st Cir. 2002).  To claim the deduction, the taxpayer had to show "active conduct of a trade or business within a possession."  *Id.* at 343.  Based on this history, the Tax Court interpreted § 199 to require it to consider which party to a manufacturing contract "actively and extensively participated in the

---

[26] Although the IRS has made clear that the benefits and burdens analysis for § 199 differs from that for § 263A and § 936, Income Attributable to Domestic Production Activities, 70 Fed Reg. 67220, 67228 (proposed Nov. 4, 2005), the Court still considers interpretations of these other provisions instructive.  *See ADVO*, 141 T.C. at 318.

[27] To be sure, § 263A, unlike § 199, allows property to have more than one owner for tax purposes.  *ADVO*, 141 T.C. at 322.  But this mattered not in *Suzy's Zoo* because the Tax Court and Ninth Circuit held the card company was *the* owner for tax purposes.  *See* 114 T.C. at 8 (holding that the greeting card company, not its printer, "is and has been the only 'owner' of its paper products up until the time that they are sold to its customers").

management and operations of the [manufacturing] activity" as a separate factor under the benefits and burdens analysis. 141 T.C. at 330. To the extent § 936's principles guide here, the Court concludes they are better assessed as part of the contracting parties' control. *See Meredith Corp.*, 405 F. Supp. 3d at 807.

In assessing these indicia of control, the *ADVO* court found the printers had more of them because the taxpayer did not "exercise[] day-to-day control over the activities of the printer." 141 T.C. at 328. For instance, the printers "set up the machines, loaded the paper, fine-tuned the color keys, ran the printing process, [and] supervised the quality." *Id.* The Tax Court found this outweighed the taxpayer's control over the specific paper, presses, and factory locations used to make their ads. *Id.* at 327–28.

Although this case presents several parallels, Plaintiff's involvement—especially with respect to quality control—was far more extensive than ADVO's and often involved day-to-day control over its printers. As Prince, Plaintiff's unrebutted expert, testified: "[Plaintiff] exerted far more control over the printing process than ADVO." ECF No. 90-7 at 34. The Court found Prince's testimony particularly persuasive on this point because he served as the Government's expert in *ADVO*. 141 T.C. at 309. Even the Government, to some extent, agreed. *See* ECF No. 100 at 33 ¶¶ 124–25.

Indeed, the Tax Court made no mention of ADVO having:

- full-time quality control employees either stationed at a printer's plant or assigned to visit them during scheduled print runs, ECF No. 60 ¶¶ 139, 143; ECF No. 98 at 188:14–25;

- input on whether the first printed pages sufficiently matched an ADVO proof for color, ECF No. 98 at 185:22;

- daily contact—sometimes at 3 a.m.—with a printer's customer account manager during printing, ECF No. 60 ¶ 216; ECF No. 72 at 32:13–22;

- control over which shift at a printing plant produced certain copies of certain magazines, ECF No. 97 at 72:1–73:14; or

- control over the printers' use of new technology to save costs, much less the ability to detect printer's unauthorized use of such technology, ECF No. 87-5 at 28; ECF No. 97 at 75:5–22, 77:21–25, 79:2–6.

As Prince testified, Plaintiff's ability to notice its printers began using GCR to reduce ink costs demonstrated "control" and that "[t]hey are watching their printers carefully because they're concerned about the quality of the jobs." ECF No. 99 at 80:15–16, 81:4. Given Plaintiff's involvement, this was not a scenario in which the "details of the manufacturing process" were left to the printers. § 1.199-3(f)(4) ex. 1.

At the same time, the printers maintained control over the property during the printing process, too. First, to the extent Plaintiff had control over the above decisions, much of that control was contingent upon the printers' cooperation. ECF No. 60 ¶ 280 (stipulating Plaintiff and the printers mutually agreed as to which plants were used for publications); *id.* ¶¶ 275–76 (stipulating that the printers also set requirements for Plaintiff's paper and files); *id.* ¶ 297 (stipulating Plaintiff could not dictate which of the printers' employees worked on its publications); ECF No. 98 at 218:12–17 (showing Plaintiff and RRD jointly agreed on printing quality standards). The printers also maintained control through their own quality control staff and operation of the printing presses. *Id.* at 63:4–7, 186:24–25.

Second, the printers also exerted control through possession of the blank paper and the work in process at their printing plants during the printing process. ECF No. 60 ¶ 246. They also, under some contracts, could deny Plaintiff's request for the unconditional return of its stored paper upon demand. *Id.* ¶ 247. They also did not have to let Plaintiff remove work in process from their plants without payment. *Id.* ¶¶ 248.

And finally, the printers' employees exerted control through the operation and maintenance of the printing presses, which Plaintiff's employees could not touch. *Id.* ¶¶ 285–87; ECF No. 98 at 188:4–6. Weighing both sides, the Court finds the amount of control each party exerted over the publications during the printing process to be equal. Thus, the Court finds this factor is neutral.

### 5.   Risk of Loss

The Court also must consider which party bears the "risk of loss." *Upham*, 923 F.2d at 1334. The risk of loss traditionally concerns damage to the physical property and "[r]esponsibility for bearing the costs and expenses of such damage, destruction, or misplacement." *Risk of Loss*, Black's Law Dictionary (11th ed. 2019). Similarly, several courts assessing the risk of loss under a benefits and burdens analysis focused on who paid for making good for "defective production," *Suzy's Zoo*, 273 F.3d at 882, or replacing damaged property, *Harmston v. Comm'r*, 61 T.C. 216, 230 (1973), *aff'd*, 528 F.2d 55 (9th Cir. 1976).

Some of these cases suggest that risk of loss also should encompass downstream economic losses from such physical property damage and defective production as well as losses from increased costs of doing business or slagging revenue. *See ADVO*, 141 T.C. at 329; *Crooks v. Comm'r*, 453 F.3d 653, 656 (6th Cir. 2006) (concluding that the taxpayer's guaranteed revenue meant it did not bear the risk of loss); *Arevalo v. Comm'r*, 469 F.3d 436, 440 (5th Cir. 2006) (same). The *ADVO* court found that the printers' risk of loss with respect to damage to the printed ads neutralized ADVO's risk of loss with respect to lost profits. 141 T.C. at 329–30.

However, the Treasury regulations distinguish between the "risk of loss or damage during manufacturing" and the "economic loss or gain upon the sale of the [property]." § 1.199-3(f)(4)

ex. 1.  Therefore, to avoid double counting economic losses, the Court will only assess losses from damage, both immediate and downstream, as part of the risk of loss.[28]

First, most of the contracts plainly stated that the printers bore the risk of loss until either shipment or invoicing.  ECF No. 96-3 at 27 ¶ 43; ECF No. 85-2 at 29 ¶ 43; ECF No. 85-5 at 303 ¶ 54; ECF No. 85-6 at 22 ¶ 41; ECF No. 85-11 at 163 ¶ 12.1.  Although some later contracts refer instead to a printer's "duty to protect," ECF No. 85-9 at 31 ¶41, or "duty of care," ECF No. 85-12 at 37 ¶ 12.2, the Court finds such clauses merely call a rose by another name.  Given the contracts' unambiguous text, the risk of loss belonged to the printers for tax purposes.[29]

Furthermore, the substance of most of the contracts also makes clear that the printers bore the risk of loss during the manufacturing process, which is the relevant time period.  This can be gleaned from the indemnification and insurance provisions.  Most of the contracts required the printers to purchase and carry property insurance on Plaintiff-supplied materials and tangible copies of Plaintiff's publications during production and until they were shipped or stored to a carrier or storage.  ECF No. 60 ¶¶ 250, 253; *see also* ECF No. 85-2 at 27 ¶ 41.1; ECF No. 85-5 at 24 ¶ 41.1.  If the printers exhausted these policies' limits, the contracts required them to settle any remaining damage claims with Plaintiff.  ECF No. 60 ¶ 254.

Plaintiff counters that it, too, purchased insurance on its paper and publications to cover not just property damage but lost profits.[30]  *Id.* ¶¶ 177, 181.  However, the contracts did not require Plaintiff to do so.  *Id.* ¶ 255; *see also* ECF No. 85-2 at 28 ¶ 41.5 ("[Plaintiff] shall carry

---

[28] By contrast, the Court assesses losses from shifting costs and revenue under the economic profits and losses factor below.

[29] It is notable Weirich, Plaintiff's director of risk management, did not object on cross-examination to the Government's assertion that the printers had the risk of loss.  ECF No. 98 at 166:8–10.

[30] Plaintiff's insurance covered all of its property, not just its property located at the printers' plants.  ECF No. 98 at 163:20–23.

such additional insurance as [Plaintiff] deems desirable on all material furnished by [Plaintiff] . . . ."). Therefore, the contracts assigned this burden of ownership to the printers. That Plaintiff chose to take on some of that burden voluntarily matters not.

On the other hand, the risk of loss indeed fell to Plaintiff with respect to downstream economic losses from defective production. When the printers misprinted an ad, they only owed Plaintiff the costs of physically reproducing the ad along with some amount of "editorial support." *E.g.*, ECF No. 60 ¶ 166; ECF No. 96-3 at 17 ¶ 24.2. Barring "intentional, fraudulent, or reckless acts, willful misconduct, or gross negligence," the printers did not have to reimburse Plaintiff for the lost revenue from compensating an unsatisfied advertiser. ECF No. 60 ¶ 165. For instance, a misprinted ad may cost Plaintiff $50,000 in ad revenue while the printer would lose just $15,000 in printing fees. ECF No. 97 at 47:24–48:3.

Even so, on balance, the Court finds that the risk-of-loss factor favors the Government because the contracts placed the most concrete and predictable risks of loss on the printers.[31]

6. Economic Profit or Loss

The Court must consider which party receives the "benefit from the operation or disposition of the property." *Upham*, 923 F.2d at 1334. A court must parse "the complex terms of the . . . agreement" to determine which contracting party "would receive the principal benefits from the product's financial success." *Id.* With contract manufacturing and § 199, this factor focuses on which party had the greater chance to profit or lose money based on who bore the costs of the physical manufacturing process. *See* § 1.199-3(f)(4).

---

[31] To the extent Plaintiff faced reputational risks from defective production or property damage, those risks were cancelled out by the similar reputational risks to printers. For instance, while Plaintiff could lose readers and advertisers from poorly printed magazines, the printers could also lose clients. Furthermore, such risks are not particularly probative of the benefits and burdens of ownership because such risks are inherent in any manufacturing contract.

Courts should assess who would benefit (or suffer) from changes to cost in manufacturing labor and raw materials. *ADVO*, 141 T.C. at 329. If the contract provides for fixed costs, and the manufacturer is paid the same amount per widget regardless of its actual supply and labor costs, the profits factor likely cuts in the contract manufacturer's favor. § 1.199-3(f)(4). By contrast, if the contract calls for the taxpayer to reimburse the contract manufacturer's costs and pay some additional fee (so-called cost-plus contracting), the factor almost certainly cuts in the taxpayer's favor.[32] *See id.* In *ADVO*, the Tax Court noted that the contract printer faced risks from changes in the cost of paper and ink. 141 T.C. at 329.

Here, the contracts between Plaintiff and its printers bore hallmarks of both cost-plus and fixed-cost arrangements while both paid for various raw materials. This can be seen with the way Plaintiff and its printers approached costs from ink, manufacturing efficiencies, and paper.

a. Ink

Plaintiff agreed to cover some—but not all—of its printers' ink cost changes for most of the tax years at issue. For instance, the 2005–2011 RRD contract ensured Plaintiff bore some of these changes by providing that ink prices would "be adjusted based on industry-wide percentage price increases which occur on or after January 1, 2006." ECF No. 96-3 at 9 ¶ 13.1; *see also* ECF No. 97 at 85:9–11 (showing the 2005 contract required RRD to pass on increased ink costs to Plaintiff); ECF No. 85-6 at 9 ¶ 14.3 (stating Quad "shall increase or decrease the ink prices in the Price Schedule by adding thereto or subtracting therefrom the actual percentage increase or decrease of Printer's cost"); ECF No. 85-12 at 32 ¶ 5.3.1 (stating in the 2011 Brown contract that

---

[32] In *ADVO*, the Tax Court considered the manufacturing contract's division of costs as part of the risk of loss. 141 T.C. at 329–30. As discussed *supra*, the Court concludes, like the Government, that cost allocation is more appropriately considered as to who profits from the manufacturing process. *See* ECF No. 100 at 38.

prices for Brown-supplied materials, including ink, are subject to change based on Brown's costs).  In other words, even if the printers priced ink based on the number of pages printed, ECF No. 60 ¶¶ 18, 266, Plaintiff had to reimburse the printers for at least some of their actual ink costs.  Therefore, the contracts were not truly fixed-price with respect to ink.[33]

### b.  Manufacturing Efficiencies and Labor

The printers also shared some—but not all—of the profits from increased efficiencies in the manufacturing process.  The contracts, for one, required Plaintiff and its printers to negotiate new prices or a credit for Plaintiff if the printers reduced their costs through new technology. *E.g.*, ECF No. 96-3 at 17 ¶ 25.2; *see also* ECF No. 60 ¶ 269.

This provision, in fact, led to the three printers reducing Plaintiff's printing costs after they found a way to more efficiently use ink.  After Plaintiff discovered RRD, Brown, and Quad were using GCR to conserve ink, Plaintiff negotiated reduced prices.  ECF No. 97 at 75:20–22; 77:21–25; 79:2–6.  In other words, Plaintiff shared the profits from an improved manufacturing process.  This stands in contrast to Example 1 from the Treasury guidelines, in which the hypothetical manufacturer faced fixed-prices but could claim all the profits from the manufacturing process.  *See* § 1.199-3(f)(4).

To be sure, the printers possibly stood to gain more of the profits and bear more of economic loss from manufacturing in other respects.  Plaintiff remained somewhat insulated

---

[33] To be sure, Plaintiff likely paid a lesser share of ink costs when it tied ink prices to CPI in 2011 with RRD and 2012 with Quad.  ECF No. 85-5 131–32 ¶ 13.1; ECF No. 85-9 18 ¶ 14.3; *but see*  ECF No. 85-12 at 32 ¶ 5.3.1 (showing no such change occurred with Brown).  Tying ink prices to CPI does not guarantee the printers will recover changes in ink costs because while ink prices could go up, the CPI may remain the same or increase by a lesser amount.  But this subtlety represents a small minority of the tax years at issue, and, as discussed below, does not affect the Court's conclusion with respect to profits for those years or the disputed period as a whole.

from changes in labor cost.  The parties adjusted manufacturing prices yearly according to a formula based on CPI, not the printers' actual labor costs.  *E.g.*, ECF No. 96-3 at 10 ¶ 15.1; ECF No. 85-6 at 8 ¶ 14.1  And while Plaintiff had to pay for overtime work, that only was when its own faulty paper or altered production schedule created the need for such overtime.  *E.g.*, ECF No. 96-3 at 15 ¶ 21.  Regardless, the contracts, read in their entirety, show that both Plaintiff and its printers stood to profit—or suffer losses—from changes to the manufacturing process.

 c. Paper

  Finally, Plaintiff agreed to cover almost all of the printers' paper costs for the publications because Plaintiff purchased the paper.  ECF No. 60 ¶¶ 66–67.  This is particularly relevant because paper was the most expensive component of producing Plaintiff's publications.  *See id.* ¶¶ 69–70, 174.  At trial, Plaintiff offered unrebutted testimony that it stood to lose (or make) millions of dollars based on paper-price fluctuations.  ECF No. 97 at 241:19–20; *see also* ECF No. 60 ¶¶ 92–94 (stipulating Plaintiff bore the risk of any changes in paper price).  In fact, Plaintiff may "have to shut down a title altogether because [it] couldn't afford the paper."  ECF No. 97 at 240:18–19.  The printers were only exposed to paper costs to the extent they had to pay for any overconsumption of Plaintiff's paper.  ECF No. 60 ¶ 90.  At the same time, the printers had to share half of the profits from any paper underconsumption with Plaintiff.  ECF No. 96-3 ¶ at 3 ¶ 5.1; ECF No. 85-7 at 81–82; ECF No. 85-5 at 125 ¶ 5.1; *see also* ECF No. 60 ¶ 91.  So, although the printers may have been equally or more exposed to profits and losses from ink and labor, Plaintiff exclusively accepted the profits and losses with respect to the biggest raw material, paper.

  The takeaway from all of this is that both sides stood to gain and lose quite a bit from the manufacturing contracts.  These contracts placed some economic gambles on one party and some

on both.  Thus, the economic loss or gain factor does not clearly favor Plaintiff or the Government, and the Court finds it to be neutral.

      7.   Underlying Rights in Property

Eighth Circuit precedent and Treasury regulations counsel that ownership of the manufactured property's underlying rights should be considered as a benefit (or burden) of ownership.  *See Upham*, 923 F.2d at 1334; § 1.199-3(f)(4) ex. 1.  The Treasury Regulations' Example 1 discussed which party designed the product, owns the "intellectual property attributable" to the product's design, and any restrictions on exploitation of that intellectual property.  § 1.199-3(f)(4) ex. 1.  Although Example 1 clarifies that such intellectual property rights are neither necessary nor sufficient to claim the benefits and burdens of ownership, *see id.*, the discussion suggests courts should consider the matter.

The Eighth Circuit also suggested that, with the transfer of a film, "no sale occurs for federal tax purposes, unless the parties transfer both the negative and all substantial rights accompanying a movie copyright."  *Upham*, 923 F.2d at 1334 (citing *Durkin v. Comm'r*, 872 F.2d 1271, 1275 (7th Cir. 1989)).  *Upham* involved the purported sale of a film, not a magazine, but the Eighth Circuit reasoned that "ownership of the negative without the copyright prerequisites lacks any value."  *Id.*  After all, the holder of a physical film without the copyright cannot sell that film to anyone but the copyright holder.  *See also Durkin*, 872 F.2d at 1275 (citing *Goldsmith v. Comm'r*, 143 F.2d 466, 467 (2d Cir.1944) (Hand, J., concurring)).  This approach to intangible rights works in concert with the Eighth Circuit's approach to tangible property.  After all, one indicia of ownership of tangible property is the ability to use and dispose of it as one pleases, a so-called "proprietary interest."  *See, e.g.*, *Vinal v. Peterson Mortuary, Inc.*, 353 F.2d 814, 818 (8th Cir. 1965).

In *Peterson Mortuary*, a funeral company purchased two standard vehicles and contracted with an auto body shop to convert one into an ambulance and another into a hearse. *Id.* at 815. The Eighth Circuit reversed the district court's ruling that the funeral company was not the manufacturer for tax purposes. *Id.* at 818. It did so, in part, because the funeral company never forfeited ownership of the original vehicles, thus denying the auto body shop the ability to sell "the right to use or sell the completed ambulance or hearse." *Id.*

Here, it is unquestioned that Plaintiff created intellectual property that was the basis for the physical product. ECF No. 60 ¶ 24. It also is undisputed that only Plaintiff could exploit these underlying property rights in its publications. *E.g.*, ECF No. 85-5 at 148 ¶ 42 ("Nothing herein will be deemed to accord Printer any right to use any material or information received by Printer as a result of this Agreement, except as provided for the purpose of performing the Work."); ECF No. 85-6 at 22 ¶ 40 (same). And, as discussed above, the printers could not extract value from the publications or content by allowing any lien to be placed on them. *E.g.*, ECF No. 85-2 at 29 ¶ 42.1. It also is undisputed that the printers could not sell unfinished pages or whole copies of the magazine to other parties. ECF No. 60 ¶¶ 208, 210.

In other words, much like the movie investors in *Upham*, and the automobile shop in *Peterson Mortuary*, the printers could not profit from the physical works in process as they saw fit. In sum, the Court concludes that underlying rights in the QPP are one of the benefits and burdens of ownership and that this factor cuts in Plaintiff's favor.

8.   Property Taxes

The Court finally considers who paid property taxes. *Upham*, 923 F.2d at 1334. As paying property tax is a burden, payment of such taxes cuts in favor of ownership. The *ADVO*

court found the property-tax factor to be neutral because there was no evidence either contracting party paid property taxes.  141 T.C. at 328.

That is not so here.  It is undisputed that Plaintiff paid state personal property taxes on the paper and work in process at RRD's Kentucky printing plants for 2006 through 2012.  ECF No. 60 ¶ 86; *see also* ECF No. 88-5 (showing Plaintiff stored millions of dollars' worth of property in the Kentucky plants).

The Government argues the Court should find this factor to be neutral for two reasons. First, the Government suggests the Kentucky property taxes deserve little weight because Plaintiff paid no property taxes in Illinois or in any state for property stored at Brown's or Quad's plants.  ECF No. 100 at 29.  But Illinois's constitution prohibits personal property taxes. Ill. Const. art. IX, § 5.  With respect to the other states, Plaintiff argues Kentucky was the only state that charged personal property taxes where Plaintiff stored enough property to pay those taxes.  ECF No. 103 at 51.  The Government offers no rebuttal.

Second, the Government argues the record contains evidence that RRD paid personal property taxes on all work in process.  This evidence is limited to a letter from RRD to the IRS, ECF No. 92-11 at 6, and Maki's vague assertion during her deposition, ECF No. 92-15 at 84:18–85:1.  Plaintiff argues that neither constitutes admissible evidence under hearsay and lack-of-personal-knowledge objections.

First, the Court already addressed the hearsay issue regarding the RRD letter when discussing how Plaintiff and its printers treated the transaction.  That ruling applies with equal force here, and the letter remains admissible as a business record created in RRD's ordinary course of business.  Second, Maki's deposition, at least as relevant here, remains admissible because she testified as a corporate representative in a Federal Rule of Civil Procedure 30

deposition. *See, e.g.*, *Sara Lee Corp. v. Kraft Foods Inc.*, 276 F.R.D. 500, 503 (N.D. Ill. 2011)

(citing *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894–95 (7th Cir. 2004)).

This does not mean, however, that the Court must accept the letter and Maki's testimony

at face value.  The Court gave the IRS letter and Maki's assertions exceedingly little weight with

respect to personal property taxes because of their vague and conclusory nature.  First, the letter

to the IRS merely states that with respect to all RRD customers, "personal property taxes, where

applicable, are the responsibility of RRD on all applicable inventories and properties."  ECF

No. 92-11 at 6.  Such a vague statement does not rebut the actual personal property tax returns

and check payments supplied by Plaintiff.  *See* ECF No. 88-5.

So too with Maki, who did not specify when or to whom RRD purportedly paid personal

property taxes on Plaintiff's property.  When asked about Kentucky, she said RRD presumably

paid personal property taxes on the labor and ink put into manipulating Plaintiff's paper.  ECF

No. 92-15 at 50:9–20, 84:18–85:1.  Yet her testimony lacks any specificity as to RRD's property

tax bill and the Government has not produced any documents supporting her assertions.  And

regardless, assuming RRD paid personal property taxes on Plaintiff's publications, it presumably

would have paid less than Plaintiff because Plaintiff's paper was the most valuable input into the

work in process.  *See* ECF No. 60 ¶¶ 70, 174.

In other words, while the Court admitted the Government's evidence as to the property

tax factor, the Court gives it less weight because of its vague and qualified assertions.  This

stands in contrast to Plaintiff's concrete—and unrebutted—testimony that it paid personal

property taxes on the QPP.  ECF No. 97 at 87:25–88:4; ECF No. 88-5. Therefore, the Court finds

the property tax factor cuts in Plaintiff's favor, too.

Given these conclusions of law, most of the benefits and burdens of ownership factors are either neutral or cut in Plaintiff's favor. Plaintiff thus carried the benefits and burdens of ownership in the publications while printers produced them.

### III. CONCLUSION

Given the Court's findings of fact and conclusions of law, the Government owes Plaintiff a tax refund. Admittedly, it might seem more natural for a tax deduction meant to promote manufacturing to go to hands-on manufactures. But that is neither the law Congress authored nor the regulations the Treasury prescribed. And given decades of tax law that treated taxpayers who never touched a machine as a manufacturer, § 199 is no anomaly. The Court instructs the parties to agree on tax and interest computations for tax years 2006–2012 and to submit a separate form of judgment in accordance with the Court's decision. After that, the Court will direct the Clerk to enter judgment for Plaintiff.

IT IS SO ORDERED.

Dated this 19th day of March 2020.

_____
ROBERT W. PRATT, Judge
U.S. DISTRICT COURT